752 F.2d 694
 243 U.S.App.D.C. 237, 53 USLW 2381
 PARALYZED VETERANS OF AMERICA, American Coalition of
Citizens with Disabilities, American Council of
the Blind, Petitioners,
v.
CIVIL AERONAUTICS BOARD, Federal Aviation Administration,
United States Department of Transportation, Respondents,
Regional Airline Association, Intervenor.
 No. 83-1055.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 31, 1983.
Decided Jan. 18, 1985.
Opinion on Denial of Rehearing and Rehearing En Banc April 26, 1985.
 
 Douglas L. Parker, Washington, D.C., with whom Karen Peltz Strauss and Arlene J. Battis, Washington, D.C., were on the brief, for petitioners.
 David Schaffer, Atty., C.A.B., Washington, D.C., with whom William Bradford Reynolds, Asst. Atty. Gen., Dept. of Justice, Ivars V. Mellups, Acting Gen. Counsel and Thomas L. Ray, Asst. Gen. Counsel, C.A.B., Washington, D.C., were on brief, for respondents. Robert B. Nicholson and Margaret G. Halpern, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 Calvin Davison, Washington, D.C., for intervenor. David H. Solomon, Washington, D.C., also entered an appearance for intervenor.
 Before WALD and MIKVA, Circuit Judges, and BAZELON, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge BAZELON.
 BAZELON, Senior Circuit Judge:
 
 
 1
 Petitioners Paralyzed Veterans of America (PVA) and other organizations representing disabled citizens[1] challenge final regulations of the Civil Aeronautics Board (CAB or Board) implementing section 504 of the Rehabilitation Act of 1973 (the Act) with respect to commercial airlines.[2] The regulations were designed to prevent discrimination against handicapped persons in air transportation. The most important issue presented by this case concerns the scope of the CAB's Amended Final Rule, which the Board has applied only to certain small airlines receiving direct federal subsidies. Petitioners maintain that the Board is required by law to apply its regulations to all commercial air carriers. We agree. As to the substance of those regulations, however, which petitioners challenge on account of the CAB's definition of "qualified handicapped individual" and aspects of its 48-hour advance notice provision, we find respondents' position more persuasive. Accordingly, we vacate the regulations in part and remand them in part.
 
 I. BACKGROUND
 A. From Statute to Rulemaking
 
 2
 Section 504 of the Rehabilitation Act of 1973 (section 504) provides:
 
 
 3
 No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.[3]
 
 
 4
 As enacted, the statute did not provide for administrative implementation of section 504's mandate; it was silent as to the exercise of regulatory authority.[4] In 1976, however, the President issued Executive Order 11,914, requiring the Secretary of Health, Education and Welfare (HEW) to coordinate the implementation and enforcement of section 504 by all federal agencies.[5] In 1977, prodded by an order of our district court,[6] HEW did adopt regulations implementing section 504 as it applied to those programs and activities for which HEW was itself a source of federal financial assistance.[7] Finally, on January 13, 1978, the Secretary of HEW issued guidelines directing other federal agencies to begin their own rulemaking proceedings within ninety days and to issue final regulations no later than one hundred thirty-five days following the close of the comment periods for the proposed rules.[8]
 
 
 5
 The Civil Aeronautics Board commenced its rulemaking proceedings on June 6, 1979.[9] Because of the complexities of the issues in this case, both jurisdictional and substantive, it will be helpful to summarize those proceedings in considerable detail.
 
 
 6
 In its Notice of Proposed Rulemaking the Board proposed "new rules to prohibit unlawful discrimination against disabled travelers and to implement section 504 of the Rehabilitation Act of 1973."[10] Although the CAB noted that "[t]his proceeding began at the Board's initiative and with a petition for rulemaking filed by the National Federation of the Blind,"[11] petitioners observe, and respondents do not dispute, that "the Board's initiative" was prompted at least in part by pressure from HEW Secretary Joseph Califano.[12] In its discussion of the proposed new rules' "Introduction and Background," however, the Board's position was a strong one:
 
 
 7
 A review of the problems that have been presented to the Board regarding difficulties encountered by handicapped persons in air transportation demonstrates not only a need for regulations under section 504 of the Rehabilitation Act, but also a significant need for the handicapped to receive adequate, nondiscriminatory service in air transportation in general.... Therefore, we have decided that the scope of this rulemaking should include any discrimination against passengers and prospective passengers on the basis of a handicapping condition, and the availability of adequate, reasonable service to handicapped persons. We believe that the burden of showing that airline service to handicapped persons cannot be provided should be on the air carrier.[13]
 
 
 8
 Also included in the Board's "Introduction and Background" discussion were several important references to the agency's statutory authority. First, the CAB wished to "emphasize that the handicapped are protected by the adequacy of service and antidiscrimination provisions of section 404 of the Federal Aviation Act [49 U.S.C. Sec. 1374], which are applicable to all air carriers, whether or not receiving Federal financial assistance."[14] It relied upon this fact as a partial justification for declining to propose any regulation of airline employment practices, noting that other agencies, such as the Department of Labor or the Justice Department, would have "the experience and skill necessary to do the job effectively."[15] Moreover, the CAB reasoned:
 
 
 9
 The Board extends direct Federal subsidies only to a small number of air carriers, so that the reach of our section 504 jurisdiction would not have a significant effect on industry employment. While we can prevent discrimination in air transportation under section 404 of the Federal Aviation Act without clear section 504 jurisdiction, the same is not true of employment. The Board would have no authority to regulate employment practices of unsubsidized carriers unless those practices somehow caused discrimination in transportation.[16]
 
 
 10
 The CAB's initial efforts to implement section 504 were further constrained by its decision "not to propose to require structural modifications of aircraft at this time" on the ground of its having insufficient information regarding alternatives, costs, and benefits.[17] Nevertheless, the Board proposed, and invited public comment upon, regulations that would apply "to all certificated carriers and air taxis [commuter carriers] in their operations with aircraft of more than 30-seat passenger capacity."[18] Conceding that "some aspects of the rules would merely make explicit what is already implicitly required by section 404,"[19] and that they might prove too burdensome or impractical for certain small carriers, the Board went on to suggest regulations that it believed
 
 
 11
 strike a reasonable balance among the interest of handicapped persons in the greatest possible convenience and freedom of choice in their use of air transportation services, the legitimate requirements of air safety, and the economic reality that costs incurred by carriers will be passed on to consumers in the form of higher air fares, or to the handicapped in the form of special charges.[20]
 
 B. The Proposed Rules: Substance and Scope
 
 12
 The regulations developed by the CAB were tripartite. Subpart A--"General Provisions"--prohibited "discrimination in air transportation against qualified handicapped persons."[21] It stated that the CAB's purpose in adding a new Part 382--"Nondiscrimination on the Basis of Handicap"--to Chapter II of Title 14, Code of Federal Regulations was
 
 
 13
 to ensure: (a) That handicapped persons receive reasonable access to commercial air transportation, (b) that certain specific practices are prohibited, and (c) that certain specific changes in service are made. The part is designed to ensure that transportation of handicapped persons is integrated into the overall air transportation system as much as possible.[22]
 
 
 14
 Section 382.4 of Subpart A--a single sentence titled "Prohibition against discrimination"--provided:
 
 
 15
 A carrier shall not, on the basis of handicap, exclude any qualified handicapped persons from participation in, deny them the benefits of, or otherwise subject them to discrimination in the provision of air transportation or related services.[23]
 
 
 16
 Section 382.5 of Subpart A prohibited air carriers from providing "different or separate" transportation services to qualified handicapped persons, or from denying any services available to other passengers, unless such actions were "reasonably necessary."[24] Subpart A left the specific words "reasonably necessary" undefined, but did, in section 382.3, define the terms "Carrier,"[25] "Conditions for air transportation,"[26] "Facility,"[27] "Handicapped person,"[28] and "Qualified handicapped person,"[29] each of which assumes considerable significance in the controversy before us.
 
 
 17
 Subpart B--"Specific Requirements"--provided detailed guidelines to be followed by each carrier with regard to accessibility of facilities and services,[30] the availability of information,[31] refusal of service,[32] guide dogs,[33] the use of Braille,[34] and service to be provided to incontinent passengers and to passengers unable to feed themselves.[35] Subpart B also specifically prohibited carriers from conditioning the carriage of handicapped passengers or their baggage, including wheelchairs, on any waiver of liability for personal injury or property damage and forbade "any limitation of liability that is stricter than the limitations applied to all passengers and baggage."[36] That section of Subpart B with which the instant case is most concerned, however, and which serves as an important illustration of the specificity and detail of the regulations at issue, was section 382.14, "Availability of services and equipment," providing in pertinent part as follows:
 
 
 18
 (a) Carriers shall ensure the availability of:
 
 
 19
 (1) Necessary life-support systems, such as oxygen, for on-board use; and
 
 
 20
 (2) Personnel and equipment to assist in boarding, moving to restrooms, deplaning, baggage handling, and making ground connections, including ground wheelchairs, aisle chairs and, if necessary, mechanical boarding lifts.
 
 
 21
 (b) Carriers shall not establish advance notice requirements for the provision of special assistance unless that assistance is extensive. Carriers may establish reasonable advance notice requirements of up to 48 hours for the provision of extensive special assistance. For the purposes of this paragraph, carrier-provided wheelchairs, oxygen for on-board use, and mechanical boarding lifts will be considered extensive special assistance.[37]
 
 
 22
 Subpart C of the regulations initially proposed by the Board--"Compliance"--mandated that each carrier provide formal assurances to the CAB "that it will comply with this part"[38] and specified the means for so doing. Each carrier, for example, was required to "maintain an employees' manual containing company rules for accommodating handicapped passengers,"[39] to formally designate "at least one person ... to coordinate its efforts to comply with this part,"[40] and not only to "[e]valuate its current policies and practices and effects for compliance" but also to "[e]stablish a system for periodically reviewing and updating the evaluation."[41] The requisite "evaluation and modification of practices" was to include "a reasonable effort to consult with and obtain the views of handicapped persons and experts on handicapping conditions."[42]
 
 
 23
 In addition, under Subpart C, every carrier was required, within 180 days after the effective date of the proposed regulations, to "adopt a plan that provides for the prompt and equitable resolution of complaints alleging any action prohibited by this part ...."[43] Such a complaint might be filed by any person who believed "that he or she has been a victim of discriminatory action" by a carrier.[44] Finally, section 382.26 of Subpart C, Procedures for noncompliance," authorized the Director of the Bureau of Consumer Protection to institute enforcement proceedings. If, after notice and opportunity for a hearing, such proceedings "[f]ound a failure by the carrier to comply with a requirement of this part," the Board was empowered to "order suspension or termination of, or refuse to grant or continue Federal financial assistance" to the offending carrier, or to "use any other means authorized by law to ensure compliance."[45]
 
 
 24
 In response to its request for comments on its proposed regulations, the CAB received a large number of suggestions and criticisms from airlines, airline trade associations, flight crew unions, government agencies, disabled individuals and organizations representing handicapped persons, including petitioners.[46]
 
 
 25
 C. The Final Rules: Comment, Compromise, and Constriction
 
 
 26
 In general, the airlines objected to the adoption of the proposed regulations, arguing that such rules were inconsistent with recent congressional initiatives aimed at reducing regulation of the air transport industry and that they were unduly burdensome and duplicative.[47] At least one commenting airline contended "that unjust discrimination on the basis of handicap does not exist" and that the proposed rulemaking of the Board was not only "unnecessary" but "would cause confusion and ambiguous interpretation with the undesired result of diminished special service to handicapped persons."[48] While representatives of commuter airlines could see some merit in the proposed regulations as they applied to the large certificated carriers, they concluded that "if applied to commuter air carriers, [the rules] would result in a substantial burden on such carriers. The mere recitation of the detail and scope of the proposed requirements is staggering."[49] The larger airlines, through the comments of the Air Transport Association and several individual companies, contended not only that the proposed regulations were "redundant, confusing, and, in some cases, conflicting," but that the CAB was without jurisdiction to apply them to any airlines but those few (generally smaller ones) that received direct money subsidies from the Board.[50]
 
 
 27
 This jurisdictional contention was vigorously opposed by groups representing handicapped citizens, all of which supported the CAB's initial assertion of rulemaking authority over every certificated carrier. As to the scope of rulemaking, these groups criticized the agency, if at all, for its tentative proposal to exempt from its regulations those small commuter or air taxi opertors using aircraft of fewer than thirty seats.[51] Although the substantial submission of the Disability Rights Center and eight other groups[52] did address the legal issue of the proper reach of section 504--arguing that all airlines, whether subsidized or not, received "federal financial assistance" in the form of development grants to airports, the federal air traffic control system, exclusive operating certificates, and special investment tax credits--the vast majority of comments were directed to the substance of the rules themselves.[53]
 
 
 28
 In this regard the rulemaking proceeding below appears to have been an exemplary one. The record contains many examples of difficult and sensitive issues being painstakingly resolved, of diverse viewpoints being conscientiously considered. For example, the Board redrafted its rules to eliminate any reference to medical certificates,[54] agreeing with commenters representing the disabled who argued that terms like "reasonable belief" and "compelling evidence" were too vague, that travelers were the best judges of their own medical status and ability to fly as far as their own risk was concerned, and that the requirement might discriminate in practice between those in whom a handicap was apparent and those in whom it was not.[55] In cases where risks to other passengers are potentially involved, however, such as where "the likelihood that aggravation of the passenger's condition will cause an in-flight emergency or unscheduled landing," the Board concluded "that airlines must make determinations of flight worthiness."[56] This was to be accomplished not on the basis of a required medical certificate from "passengers' doctors [who, the airlines contended] are generally inexpert in aerospace medicine, and, therefore, unqualified to determine whether the passenger can fly" but rather "on the basis of standards clearly related to flight safety, applied in a nondiscriminatory manner by personnel who are assigned specific responsibility for this task."[57]
 
 
 29
 In general the Board's response to the comments it received upon specific provisions of the proposed rules resulted in its granting enhanced discretion to the regulated carriers. For example, a proposed rule requiring Braille information cards[58] was dropped in favor of a section that, according to the Board, "now clearly states the airlines' obligation to provide both emergency and important non-emergency information to blind or deaf passengers, but allows more flexibility in choosing methods for providing it."[59] Similarly, in dismissing the objection of several commentators to the use of the phrase "reasonably accessible" in sections 382.1 and 382.11 of the proposed rules rather than of the words "readily accessible" (the standard of the HHS guidelines in 14 C.F.R. Sec. 85.57(a)), the Board concluded that its original language reflected "the accessibility standard most appropriate to the airline industry."[60] In such areas of evident concern to handicapped persons as the storage of blind travelers' canes[61] and in-flight wheelchair policy,[62] the Board's decisionmaking resulted in Final Rules that appear to have successfully balanced the felt necessities of the handicapped with the requirements of the airlines for flexibility and the need for deference to the expertise of agencies that are charged more directly with ensuring the safety of air transportation.[63]
 
 
 30
 Nevertheless, the Board's determinations regarding two specific aspects of the Final Rules have been challenged by petitioners in this case. The first involves the CAB's definition, in its Amended Final Rule, of "Qualified Handicapped Person," to which petitioners object on two grounds: that it "unlawfully allow[s] airlines to selectively impose requirements on disabled passengers which are not required of all other passengers" and that it lacks "objective guidelines and criteria to ensure that airlines do not arbitrarily impose unnecessary conditions on disabled passengers," thus rendering the definition "vague and confusing for both airline personnel and disabled travelers."[64] Petitioners' second specific objection is to section 382.15(c) of the Final Rule, which allows airlines to require all passengers who will need "extensive special assistance" to notify the airline 48 hours in advance of their flight.[65] This provision, petitioners contend, is "especially arbitrary" and "overly broad" and "inconsistent with Section 504" because it would permit airlines "to circumvent their Section 504 responsibilities."[66]
 
 
 31
 A discussion of the administrative background of these disputed sections of the Final Rule, and of the arguments advanced for and against their validity by the parties to this case, is best deferred until a related and more fundamental question has been resolved: What airlines, in fact, have section 504 "responsibilities"? The question arises because the CAB, having engaged in the extensive and apparently scrupulous rulemaking procedure only partially summarized in the foregoing paragraphs and notes, decided that the rules it was making could, as a matter of law, be applied only to a small fraction of commercial airlines actually engaged in transporting handicapped travelers.
 
 
 32
 This interpretation of the extent of its regulatory authority represented a substantial constriction of the CAB's original position as expressed in its 1979 Notice of Proposed Rulemaking.[67] There the Board had interpreted the scope of its rulemaking authority broadly, emphasizing that such regulation of air transportation could be based not only upon section 504 of the Rehabilitation Act but also upon the adequacy of service and antidiscrimination provisions of section 404 of the Federal Aviation Act, 49 U.S.C. Sec. 1374.[68] To the extent to which the Board expressed any doubt as to the reach of its regulatory authority or the wisdom of applying the proposed rules to all carriers, it was hesitant only with regard to the employment practices of airline companies,[69] the imposition of structural requirements for aircraft,[70] and the possibility that regulations reasonably applied to most established airlines and large aircraft might prove too burdensome or impractical for certain small carriers.[71] By the time it issued its Final Rule in 1982, however, the Board was evidently hesitant to apply any specific requirements at all. Although it reaffirmed its reliance upon section 504 and upon section 404 of the Federal Aviation Act as "the requisite authority" for applying Subpart A of the rule--the general antidiscrimination provision--to all carriers,[72] it construed its statutory power to regulate discriminatory practices as extending no further:
 
 
 33
 The specific requirements in Subparts B and C of this rule ... will apply only to those carriers receiving subsidy from the Board under sections 406 or 419 of the Act, in recognition of the limited jurisdictional basis of section 504. Those carriers subject only to the general provisions of Subpart A should look to the specific requirements of Subpart B as guidance for meeting their general obligation not to discriminate.[73]
 
 
 34
 In promulgating its Final Rule, the Board reasoned that because section 504 prohibits discrimination "under any program or activity receiving Federal financial assistance,"[74] it was powerless, in implementing the statute, to "reach" any program or activity that was not receiving such assistance. "In our view," the Board announced, "only subsidy paid under either sections 406 or 419 of the Federal Aviation Act qualifies" as federal financial assistance.[75] In consequence, as petitioners note, the specific provisions of the rules designed to protect handicapped travelers apply only to those carriers receiving subsidies for the transportation of mail,[76] and to several small local and regional air carriers directly subsidized with federal funds for providing essential air-transportation to small communities.[77] As a practical matter, it is undisputed that in 1983 the CAB did not require any airline with regularly scheduled flights across the United States or overseas to comply with Subparts B or C of the regulations.[78]
 
 
 35
 Petitioners argue, in general, that the CAB's interpretation of its rulemaking authority under section 504 is excessively narrow, and that its construction of the scope of the Rehabilitation Act of 1973 is inconsistent with the intent of Congress, the regulations of other agencies, and controlling legal precedent.[79] In particular, in addition to their challenge of two specific provisions of the rules,[80] petitioners urge on several grounds that the agency erred as a matter of law in failing to apply its rules to all commercial airlines, "because these airlines receive federal financial assistance sufficient to bring them within the scope of section 504 of the Rehabilitation Act."[81] It is this last but most fundamental issue which, in our discussion of the considerable complexities involved in this petition for review, shall be first.[82]II. DISCUSSION
 
 
 36
 A. The Scope of Section 504: Defining "Federal Financial Assistance" in Context
 
 
 37
 The Rehabilitation Act of 1973 established "a comprehensive federal program aimed at improving the lot of the handicapped."[83] Section 504 of the Act represented an effort, closely modeled upon civil rights legislation already in force, to offer handicapped individuals an opportunity to pursue employment, educational, and recreational goals free of the additional handicap of discrimination against them.[84] Aware that with section 504 Congress intended "to eradicate the longstanding prejudice against the handicapped,"[85] courts have duly noted the extent to which the language of the section corresponds to that of Title VI of the Civil Rights Act of 1964[86] and Title IX of the Education Amendments of 1972,[87] frequently applying the case law developed in those areas to the resolution of problems arising under the Rehabilitation Act.[88] In our review of the rulemaking proceeding below, and particularly in our analysis of what constitutes sufficient federal "financial assistance" to bring a "program or activity" within the reach of section 504, we shall do the same.
 
 
 38
 We emphasize at the outset, however, the extent to which the issue of discrimination against the handicapped, particularly in the complex realm of commercial air transportation, is sui generis.[89] Accordingly, our holding today is a narrow one which must be understood in the unique context of two intersecting considerations. First, we are interpreting a statute that was explicitly addressed not merely to enhancing employment and ending discrimination but to expanding the mobility of handicapped persons, to reducing barriers to transportation. Second, we are concerned with the appropriate regulation of an industry that is an integral part of a "program in activity" of a very special kind. In fact, the analysis of what constitutes "federal financial assistance" in this case, and the related question of how properly to apply section 504 to the airline industry, turn in significant part upon the specific and "special" ways in which, whether directly subsidized or not, all air carriers are inextricably intertwined with the federally-funded "program or activity" of commercial air transportation. Even at its most doctrinal, this is a case, above all, about access to airplanes and the Rehabilitation Act of 1973.
 
 1. Exclusive Operating Certificates
 
 39
 In its rulemaking proceeding the CAB properly disposed of the argument made by petitioners and others that all certificated air carriers should be subject to section 504 because they receive federal financial assistance in the form of "operating certificates giving exclusive domain over valuable air routes."[90]
 
 
 40
 While an operating certificate may be of some value, it no longer gives airlines exclusive domain over routes, see section 1601(a)(1)(C) of the Act. It therefore presents a situation similar to Gottfried v. Federal Communications Commission, 655 F.2d 297 (D.C.Cir.1981), wher it was held that broadcast licenses do not count as financial assistance within the meaning of section 504.[91]
 
 
 41
 As appropriate as the Board's reliance upon our holding in Gottfried was, however, that case merits a brief discussion here, not only because it represents an important earlier construction of the statute, but also because its holding must be understood in its appropriate--and somewhat limited--context.
 
 
 42
 In Gottfried this court remanded to the FCC a challenge to the license renewal of a public television station on the ground that the Commission had failed to inquire specifically into the station's efforts to meet the programming needs of the hearing impaired.[92] Its obligation to do so, the court noted, was founded upon section 504 of the Rehabilitation Act, to which the public station was bound by virtue of its receipt of federal financial assistance.[93] The court expressly held, however, that Congress did not "intend broadcast licenses to count as 'financial assistance' within the meaning of section 504."[94] Accordingly, it declined to remand a parallel challenge to the license renewal of seven commercial stations to which, it concluded, section 504 did not apply.[95]
 
 
 43
 In so doing, this court in Gottfried reviewed the "legislative heritage" of section 504 and of the Civil Rights Act of 1964 upon which it was modeled and discovered "no reference to the FCC or to any other government program involving issuance of federal licenses."[96] Moreover, we noted that in its original regulations issued for the guidance of all federal agencies, HEW "never explicitly classified broadcast licenses as financial assistance,"[97] even though not only federal "funds" but "services of Federal personnel" and "real and personal property or any interest in or use of such personal property" and other less obviously "financial" assistance was so included.[98] Finally, we observed that the Justice Department, which had recently been designated by Executive Order as the agency responsible for coordinating federal efforts to implement section 504, had specifically held that " '[t]he term "Federal financial assistance" ... does not include licenses, for example, since licenses are not Federal assistance grants, contracts, loans, or cooperative agreements.' "[99]
 
 
 44
 In relying upon Gottfried to justify its rejection of the argument that operating certificates granted to carriers constitute "federal financial assistance" within the meaning of section 504, therefore, the Board was correct.[100] The license-specific nature of Gottfried's holding and rationale, however, limits its applicability when considering other types of federal financial assistance.[101]
 
 2. Favorable Tax Treatment
 
 45
 Petitioners note that "[f]rom its inception, the commercial aviation industry has received substantial direct and indirect assistance from the federal government," and that "[m]ost of the major airlines" received direct subsidies "in their early years."[102] Currently, they argue, such federal financial assistance takes the form not only of money subsidies under certain sections of the Federal Aviation Act but also of special investment tax credits made available to "certain railroads and airlines" by the Internal Revenue Code, 26 U.S.C. Sec. 46(a)(8) (1976 & Supp. V 1980). Respondents, by contrast, find it "inconceivable, that Congress "intended to place nondiscrimination obligations on every commercial enterprise enjoying some form of favorable tax treatment."[103]
 
 
 46
 Petitioners find support for their position in McGlotten v. Connally, 338 F.Supp. 448 (D.D.C.1972) (three-judge court), which held "that assistance provided through the tax system is within the scope of Title VI of the 1964 Civil Rights Act," since
 
 
 47
 [i]n the absence of strong legislative history to the contrary, the plain purpose of the statute is controlling. Here that purpose is clearly to eliminate discrimination in programs or activities benefitting from federal financial assistance. Distinctions as to the method of distribution of federal funds or their equivalent seem beside the point ....[104]
 
 
 48
 The three-judge court in McGlotten ruled that the tax exemption provided fraternal orders by section 501(c)(8) of the Internal Revenue Code, "[s]ince it is available only to particular groups ... operates in fact as a subsidy in favor of the particular activities these groups are pursuing. It thus falls within the coverage of the Civil Rights Act."[105] By direct and legitimate analogy, petitioners suggest, the investment tax credit available to railroads and airlines in particular by section 46(a)(8) constitutes sufficient federal financial assistance to airlines so "subsidized"[106] to trigger coverage by section 504.
 
 
 49
 In its rulemaking proceeding the CAB failed to address the tax subsidy argument. To this court, respondents argue that McGlotten is petitioners' "sole authority," that it "has had no case law progeny," that its discussion of Title VI and "federal financial assistance" was merely "dictum" in a case that was really about the state action doctrine and the equal protection clause, and that in its recent decisions holding that tax exemptions and tax deductibility do indeed constitute "a form of subsidy that is adminsitered through the tax system," Regan v. Taxation with Representation of Washington, 461 U.S. 540, 544, 103 S.Ct. 1997, 2000, 76 L.Ed.2d 129 (1983), the Supreme Court "conspicuously failed to invoke" McGlotten.[107] None of these arguments is convincing. Both in Regan and Bob Jones University v. United States, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), the Supreme Court affirmed McGlotten's fundamental approach. More important, we think, is the possibility that Congress did not intend, by granting a limited tax incentive to a particular industry or group, to thereby encompass every such industry or group, or, for that matter, individual within some ever-widening and potentially almost limitless definition of "federal financial assistance."
 
 
 50
 It is true that the industry-specific nature of the accelerated depreciation allowance permitted airline property may obviate that danger in this case. But it is also true that the exemptions and deductions at issue in McGlotten, Bob Jones, and Regan were of a much more fundamental nature than the modest incentive to capital expenditures to which petitioners point here.[108] To find that the government could force an airline to comply with a federal antidiscrimination mandate solely because it takes advantage of section 46(a)(8) tax credits would be to find the government impotent to compel such compliance if any airline should elect to forego such credits. If Congress did intend handicapped citizens to have access to air transportation and to apply the nondiscrimination principles of section 504 to all carriers, we would violate that intent by holding that a carrier could avoid compliance through its accountant, or that Congress would be giving a green light to discrimination if it ever chose to enhance federal revenues in this deficit-plagued era by closing tax loopholes or simplifying the Code.
 
 3. The National Air Traffic Control System
 
 51
 If interpreting every de minimis tax incentive as sufficient "federal financial assistance" to trigger the coverage of federal antidiscrimination statutes would be overbroad in its consequences and reach, petitioners' argument that the government's expenditure of some two billion dollars annually to provide airlines with a national system of air traffic control seems, by contrast, appropriately narrow and specific.[109] This program employs, on a twenty-four hour basis, highly-trained air traffic management personnel who monitor and control takeoffs, landings, and en route flights of civil and military aircraft in order to assure safe and expeditious air transportation. By directly financing the operation of twenty-five control centers, more than four hundred terminal control facilities, and additional flight service stations, as well as by administering its flight standards and medical fitness programs, petitioners argue, the federal government provides financial assistance that is "absolutely critical to the operation of the airlines."[110]
 
 
 52
 It cannot be seriously disputed that the safe and efficient operation of commercial air transportation depends in great measure (if not, as petitioners assert, "entirely") upon "the proper functioning of the national air traffic control system."[111] One can scarcely imagine a modern airline representing to its customers that a regularly scheduled flight will leave at a time certain and arrive reliably at its destination if this "essential service"[112] provided by the FAA did not exist. Moreover, this crucial assistance may reasonably be considered "financial." Definitions of "federal financial assistance" issued by both the Department of Health and Human Services and the Department of Justice state explicitly that the term encompasses
 
 
 53
 any grant, loan, contract, ... or any other arrangement by which the agency provides or otherwise makes available assistance in the form of: (1) Funds; (2) Services of Federal personnel; or (3) Real and personal property or any interest in or use of such property ....[113]
 
 
 54
 Consequently, petitioners' argument that the federal air traffic control system is an "arrangement" that "provides or otherwise makes available assistance in the form of ... services of Federal personnel" leads reasonably to the conclusion that the system does indeed constitute federal financial assistance to all commercial air carriers. It follows, therefore, that any and all carriers making use of the federal air traffic control system should be subject to any regulations promulgated under section 504.
 
 
 55
 Respondents attack this argument on several grounds. First, they contend that "regulatory history and common sense" make it clear that the current "services of Federal personnel" language really means "the loan or detail of Federal personnel to carry out functions which private (i.e., airline) employees would otherwise have to perform, e.g. fly airplanes."[114] We are not persuaded, however, that the language of the Justice Department's implementing regulations should be taken to signify anything less than the plain meaning of the words themselves. "As a general matter, courts eschew narrow interpretations of remedial statutes. Instead, remedial statutes are normally accorded broad construction in order to effectuate their purpose."[115] As the Senate report on the 1974 amendments to the Rehabilitation Act explained, "section 504 was enacted to prevent discrimination against all handicapped individuals ... in relation to Federal assistance in employment, housing, transportation, education, health services, or any other Federally-aided programs."[116] To that end, section 504 and the civil rights statutes with which it shares a common language and heritage must "be liberally construed in order that their beneficent objectives may be realized to the fullest extent possible."[117]
 
 
 56
 Respondents' more substantial line of attack reiterates a point first articulated by the Board in justifying its Final Rule below: "It is the position of the FAA, with which we concur, that its air traffic control services are not financial assistance to airlines. Rather, they are services provided to the public generally to ensure flight safety."[118] The federal air traffic control and safety programs, respondents suggest to this court, must be considered
 
 
 57
 in the general category of "public goods." They are the goods and services from which all citizens and businesses benefit.... Thus, for example, the government may assure clean air through a variety of means, Federally financed or operated. But the recipient of the benefit cannot be precisely located, and no one enjoys an exclusive benefit. The air controllers help to assure "safe skies"; this "assists" airlines more directly than it assists other enterprises; yet it also assists all enterprises that use the airlines or fly private planes in the course of their business. It also protects those on the ground from plane crashes. It does not, however, amount to "Federal financial assistance."
 
 
 58
 If, as PVA seems to assume, Congress had wanted to cover every enterprise benefitting from a federal program, it would have said so, but it did not.[119]
 
 
 59
 It is true that in important respects the provision of air traffic controllers might be analogized to the provision of highway patrolmen or traffic signs or signal; federal funding of such programs would not be likely to be considered the sort of "Federal financial assistance" sufficient to bring every private trucking business or other enterprise that used the highways within the scope of section 504. On the other hand, respondents concede that the air controller program "assists" airlines more directly and extensively and specifically than other enterprises. Moreover, as petitioners observe, it would be absurd to exempt a federally-funded local transit authority or school system from compliance with section 504 on the ground that public transportation benefits passengers as well as transit systems and, like public education and safe air travel, it is a "public good."[120] The fact is that the air traffic control system is indispensable to the very existence of modern commercial aviation, and that if it were not provided by the federal program now in place, it would have to be provided, and paid for, by the airlines themselves.[121]
 
 
 60
 It is at this juncture, however, that our analysis must be informed by the Supreme Court's resolution of a related problem in a case that has been decided since we heard oral argument in this matter. In Grove City College v. Bell, --- U.S. ----, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), the Court construed the language of Title IX's prohibition against sex discrimination in any "education program or activity" that is "receiving Federal financial assistance" in a manner that compels us to focus less on the mode of assistance than on the "program or activity" being assisted. In particular, although the Court warned that nothing in Title IX justified "making the application of the nondiscrimination principle dependent on the manner in which a program or activity receives federal assistance,"[122] it emphasized as well that an agency's authority to regulate under Title IX was limited by "the program specific nature of the statute."[123] Thus, even if the "economic ripple effects" of federal financial aid to a college's students resulted in additional funds for the institution's general operating budget, a plurality of the Court held, per Justice White, that only "the College's own financial aid program ... may properly be regulated under Title IX."[124]
 
 
 61
 The implications of the Grove City analysis for the case before us are not completely clear. To the extent to which petitioners argue that a national air traffic control system would have to be provided at the airlines' own expense if it were not provided by the federal government (i.e., that this federal program has "economic ripple effects" that make additional funds available for other airline operations), the Grove City plurality would appear to be unsympathetic. And if the federal air traffic control system is the "program or activity" which is deemed to receive "federal financial assistance," then the program-specific mandate of Grove City would imply that only that particular system--its personnel practices and physical facilities, for example--could be regulated under section 504. If, on the other hand, the "program or activity" at issue is deemed to be that of commercial air transportation as engaged in by the air carriers, and if the air traffic system is deemed--via its personnel and facilities--to be the "federal financial assistance" provided to that program, then any "program specificity" problem with petitioners' argument is avoided.
 
 
 62
 Such a problem is not before us in the instant case, however, because we need not reach it to hold that the CAB erred as a matter of law in failing to apply its section 504 regulations to all commercial air carriers. We base this holding upon the federal government's funding of airports and "airways," upon the necessary and inextricable integration of these facilities with all commercial air carriers and, above all, upon the clear intent of Congress in passing the Rehabilitation Act of 1973 and the effort of appropriate agencies to effectuate the mandate of section 504 in the unique context of commercial air transportation.
 
 4. Federally Assisted Airports
 
 63
 The Airport and Airway Development Act of 1970, 49 U.S.C. Sec. 1714, as amended, authorized the Secretary of Transportation "to make grants for airport development" in order "to bring about, in conformity with the national airport system plan, the establishment of a nationwide system of public airports adequate to meet the present and future needs of civil aeronautics...."[125] To this end Congress established the Airport and Airway Trust Fund, monies from which are used to construct, acquire, lease and improve facilities and equipment used in civil aviation, currently in the amount of several billion dollars annually.[126] Grants received by airports are not "earmarked" but are "obtained through the use of a single project application to cover all airport improvement projects contained in the airport's annual expenditure program."[127] Typical capital projects undertaken with the substantial federal financial assistance so obtained have been airport land acquisition, runway construction, passenger terminals, airport lighting, airport access and service roads, electronic and visual approach aids, taxiway construction, obstruction removal, and fire/rescue equipment and buildings.[128] It is undisputed that this extensive federal financial assistance to airports subjects them to the nondiscrimination mandate of the federal civil rights laws, including section 504 of the Rehabilitation Act of 1973.[129]
 
 
 64
 The critical question then becomes whether, as respondents contend, the scope of section 504 "extends to the threshold of the planes themselves, but not beyond."[130] Such a result is required, respondents argue, by virtue of "longstanding administrative interpretation," Supreme Court precedent, and a case in our own district court which "has squarely held" that the indirect assistance provided airlines using federally-funded airports did not trigger the coverage of section 504.[131] We consider, and reject, each of these arguments in turn.
 
 
 65
 First, the longstanding and, until this proceeding, consistent interpretation of federal civil rights statutes has supported the position not of respondents but of PVA. For example, in applying its Title VI regulations to federally assisted airports, the Department of Transportation explicitly included
 
 
 66
 restaurants, snack bars, gift shops, ticket counters, baggage handlers, car rental agencies, limousines and taxis franchised by the airport sponsor, insurance underwriters, and other businesses catering to the public at the airport.[132]
 
 
 67
 If these businesses are construed as receiving federal financial assistance by virtue of federal aid to airports, it is nonsensical to exclude the air carriers themselves, which surely are businesses "catering to the public at the airport." Indeed, in its own section 504 rulemaking, DOT explained that its regulations apply, inter alia, to ticket counters, boarding devices, baggage check-in and retrieval, and teletypewriters, "all of which are owned and operated by the airlines at most airports."[133] DOT's decision in 1979 not to extend its own rules to air carriers' in-flight activities obviously was a result of the CAB's assertion of such authority at that time, and of DOT's commendable effort to avoid redundant, overlapping regulations:
 
 
 68
 Following publication of [DOT's] NPRM, representatives of the DOT, FAA, HEW and the Civil Aeronautics Board (CAB) met to discuss the respective legal authority and responsibilities for improving the accessibility of air travel to handicapped persons. Following this meeting, the CAB determined that it had statutory authority to issue regulations governing air transportation of handicapped persons.... Action by the CAB ... would ensure the uniform provision of services and equipment by the airlines, needed to accomplish accessibility to air travel for handicapped persons....[134]
 
 
 69
 Of course, the CAB's initial interpretation of its rulemaking authority under section 504 was consistent with this expectation. Its Notice of Proposed Rulemaking assumed that all certificated carriers would be covered, and invited comment specifically only as to whether small commuter carriers with planes of fewer than thirty seats should be exempted.[135] This initial position of the CAB was in fact consistent with its own "longstanding administrative interpretation" of its Title VI regulations as covering programs "including"--but not limited to--those receiving direct money subsidies, and as applying not only to "money paid" but to "other federal financial assistance extended."[136] The Board's sudden reversal in this regard was contrary not only to the interpretation of other agencies in this context, but to its own.
 
 
 70
 A more substantial argument advanced by respondents is based upon two recent Supreme Court cases, one of which was sub judice at the time the instant petition for review was heard. In North Haven Board of Education v. Bell, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982), the Court concluded "that an agency's authority under Title IX both to promulgate regulations and to terminate funds is subject to the program-specific limitation of Secs. 901 and 902."[137] Thus, respondents argue, "[w]hile an airline may utilize a federally-funded program, i.e., airport operations, it is not a federally funded program itself by virtue of the airport's receipt of aid."[138] North Haven 's emphasis upon "program specificity" was, as we have noted, reaffirmed by the Court's more recent decision in Grove City College v. Bell.[139] But it is also true that in its North Haven opinion the Court expressly did "not undertake to define 'program' "[140] and that in Grove City the plurality emphasized not only that the student financial aid at issue was "sui generis" but that the intent of Congress in passing Title IX was central to its analysis.[141] In considering what we believe must also be termed the sui generis nature of commercial air transportation, as well as the intent of Congress in passing the Rehabilitation Act of 1973, combined with the postenactment administrative and legislative construction of section 504, we find that the regulations promulgated in this case must be applied to all air carriers using federally-funded airports in their "program or activity" of providing commercial air transportation.
 
 
 71
 Airports and airlines are inextricably intertwined.[142] The indissoluble nexus between them is the provision of commercial air transportation. Although airports may lease space to gift shops and airlines may publish inflight magazines or own a chain of resort hotels, when it comes to the "program or activity" of providing air transportation to the traveling public, the two entities are so functionally integrated that they become one. While it may be the case, as respondents urge, that the airline as a corporate entity does not become a federally-assisted "program" by virtue of its use of federally-assisted airports, its "program or activity" of providing commercial air transportation certainly does. Thus, section 504 may or may not reach the practices of a hotel owned and operated by an airline company; but it certainly must reach, in our view, the treatment afforded a passenger who boards that company's aircraft at, deplanes to, and reaches his destination safely and efficiently only because of, a federally-funded airport. Just as the plurality in Grove City distinguished the college's financial aid program from other programs within the institution, an airline's commercial aviation program, its activity in actually carrying passengers from one place to another, may be distinguished from its other programs or activities.
 
 
 72
 Respondents attempt to avoid this holding, finally, by pointing to a case in our district court which "squarely held"[143] that to "hold that commercial airlines fall within section 504 merely because of assistance provided to airports would expand improperly the accepted proposition that section 504 is limited to direct recipients of Federal funds."[144] The Board quoted in full and explicitly relied upon this language from Angel v. Pan American World Airways, Inc.[145] We reject it on at least three grounds, and declare Angel squarely overruled.
 
 
 73
 First, even if "airlines" on a company-wide basis are not covered by section 504, we believe their programs and activities providing commercial air transportation are, as noted above. Second, Grove City directly undermines any notion that coverage of federal antidiscrimination statutes is in any way--much less as an "accepted proposition"--"limited to direct recipients of Federal funds." As the Court held unambiguously in Grove City:
 
 
 74
 Nothing ... suggests that Congress elevated form over substance by making the application of the nondiscrimination principle dependent on the manner in which a program or activity receives federal assistance. There is no basis in the statute for the view that only institutions that themselves apply for federal aid or receive checks directly from the federal government are subject to regulation.[146]
 
 
 75
 Third, Angel depends for its holding upon an unjustifiably broad reading of Gottfried v. FCC, a case which, as we have discussed in some detail, is license-specific in its holding and rationale, and which in the consideration of federal financial assistance to airports and air transportation is thoroughly inapposite.[147]
 
 
 76
 5. Additional Considerations: The Special Administrative and Legislative Context
 
 
 77
 Our holding today that section 504 of the Rehabilitation Act of 1973 applies to all commercial air carriers and that the CAB erred in restricting the application of its section 504 regulations to those few small carriers receiving direct money subsidies is buttressed by several unique features of this case. These include the particular concern evidenced by Congress for the right of handicapped persons to travel and to have the greatest possible access to employment opportunities, the regulatory inconsistencies manifested by the Board in the proceedings below, and the recent reaffirmation by Congress of its commitment in this area through its passage of the Civil Aeronautics Board Sunset Act of 1984.
 
 
 78
 Our starting point in this case must be not only the statutory language,[148] which in the case of section 504 must be accorded "the scope that its origins dictate, ... a sweep as broad as its language,"[149] but the statute as a whole. So concerned was the Rehabilitation Act of 1973 with transportation in particular that it "established within the Federal Government the Architectural and Transportation Barriers Compliance Board" composed of, among others appointed by the President, the heads of the Departments of Health, Education, and Welfare, Transportation, Housing and Urban Development, Labor, Interior, Defense, and of the General Services Administration, Postal Service, and Veterans Administration. This Board [hereinafter ATBCB] was charged particularly with the task of reducing "architectural, transportation, and attitudinal barriers" in, inter alia, "public transportation (including air, water, and surface transportation whether interstate, foreign, intrastate or local)."[150] Consequently, it was not surprising that a 1974 Senate report should list transportation as one of five itemized areas to which section 504 was meant to apply.[151]
 
 
 79
 Congress was well aware in passing the 1973 Act, so much of which was aimed at vocational rehabilitation, that "even [if] the maximum employment opportunities for the handicapped [were] fully created, they could not be filled without the ability of handicapped individuals to get to their jobs."[152] Obviously, today more than ever, air transportation is a necessary element in securing and performing many jobs.[153] So even if transportation per se had not been singled out by Congress in section 502 of the 1973 Act, and even if the Act's administrative creation, the ATBCB, had not testified in favor of giving the broadest possible reading to section 504 in the proceedings below,[154] any fair reading of the Act reveals that maximizing employment opportunities--and therefore minimizing barriers to transportation--for the disabled goes to its very heart.[155] As the comments of the Act's "own" agency put it to the CAB: "Accessible transportation is often the key to a disabled person's employment, education, recreation, and access to social services. Without the right of access to transportation, all other civil rights are meaningless."[156]
 
 
 80
 We find additional support for our holding today in what might best be termed the need for regulatory consistency and rationality. The CAB's discussion of its section 504 authority, and particularly of its rather sudden reversal of position between 1979 and 1982, was inadequate, vague and contradictory. Not only was its reliance on Angel (and that case's misreading of Gottfried ) misplaced,[157] but even on its own terms the Board's analysis was turgid. Claiming to reject the "restrictive reading of our jurisdiction put forth by the airlines," the Board insisted that it was "adopting an approach ... that represents a compromise between applying the rule to all carriers and having no rule at all."[158] The form this "compromise" took, of course, was to apply only the general antidiscrimination provisions (Subpart A) to all airlines,[159] while applying the specific, substantive provisions (Subparts B and C) to subsidized carriers only,[160] claiming without any citation to authority that "[t]hose carriers subject only to the general provisions of Subpart A should look to the specific requirements of Subpart B as guidance for meeting their general obligation not to discriminate."[161]
 
 
 81
 Respondents are unclear, as the Board was, about the source of the CAB's conclusion that non-subsidized carriers "should look to" Subpart B. They point to the duty of every air carrier to provide "adequate service" under section 404(a) of the Federal Aviation Act[162] as supplying the "requisite authority to apply general provisions" to non-subsidized carriers.[163] But they do not--and, we believe, cannot--explain why section 404(a), if it authorizes the application of Subpart A, will not extend to Subparts B and C, which give the general provisions substance and teeth. They do not--and, we believe, cannot--explain what "look to" means, or why it is that, as respondents contend in their brief, "non-subsidized certificated carriers could not ignore the specific requirements applicable to the subsidized carriers."[164] In fact, they could do precisely that if the CAB's view of the scope of section 504 in this case were affirmed by this court.[165]
 
 
 82
 In the proceeding below, the CAB rightly rejected the airlines' assertion that its proposed rules "merely duplicate existing FAA regulations."[166] It correctly characterized the primary purpose of the FAA rules as ensuring passenger safety, reasonably deferred to the FAA's inflight safety expertise where it was appropriate to do so,[167] and noted that its own aim was "not merely to ensure that the disabled are carried safely, but to ensure that they face no unreasonable, nonsafety-related obstacles to travel. To that end, this rule covers issues ... that are not reached by the FAA rules."[168] The Board's admirable sensitivity to the work of other agencies and the need for consistency in removing unreasonable obstacles to travel, however, did not extend far enough. It was aware that regulations of the Department of Transportation already required all certificated carriers to comply with section 504's mandate in the operation of, inter alia, ticket counters, boarding devices, and baggage check-in and retrieval.[169] It was aware, indeed, that DOT had relied upon the CAB's earlier assertion of section 504 authority and was now urging the Board to exercise it.[170] Nevertheless, the CAB refused to recognize the full measure of its own authority, leading to the absurd result that handicapped persons are protected from discrimination in air transportation only up to the door of the aircraft--that is, so long as they are not being transported in the air. Our holding today obviates any such nonsensical outcome and vindicates the clear congressional purpose.[171]
 
 
 83
 In addition, restoring the scope of section 504 rulemaking authority to the dimensions originally contemplated by the CAB will vindicate that agency's hard and conscientious work in fashioning substantive requirements through these proceedings. The nondiscrimination rules will now actually apply to a meaningful number of handicapped travelers. The specific regulations fashioned with great sensitivity in order to minimize expense and regulatory burden will no longer fall--not only most heavily but exclusively--upon those small (subsidized) airlines least able to carry the load. And certain otherwise anomalous aspects of the rules, which appear to have been drafted sometimes with all carriers in mind, sometimes with only the small, subsidized carriers in mind, can now be rendered more uniform and consistent when, on remand, the regulations are in part repromulgated and applied consistently with this opinion.[172]
 
 
 84
 Finally, we note that our holding as to the scope of section 504 in the unique context of commercial air transportation is consistent with the recent action of Congress in its Civil Aeronautics Board Sunset Act of 1984.[173] That statute provides in its section 14, "Access for Handicapped Persons," that the Secretary of Transportation, when exercising authority previously the CAB's,
 
 
 85
 shall consult with the Architectural and Transportation Barriers Compliance Board established under section 502 of the Rehabilitation Act of 1973, prior to issuing or amending any order, rule, regulation or procedure that will have a significant impact on the accessibility of commercial airports or commercial air transportation for handicapped persons.[174]
 
 
 86
 Of course, to mandate a consultation with the ATBCB is not to mandate an acceptance of its recommendations, which in this case were to require not only a broad reading of section 504 but also affirmative action in the form of the structural modification of aircraft.[175] Still, this recent demonstration of the continuing concern of Congress for the accessibility not only of commercial airports but also of "commercial air transportation" for handicapped persons is significant.[176] It suggests strongly that the Rehabilitation Act of 1973 was designed and is still intended to protect handicapped air travelers as a matter of law not only before they board an aircraft and after deplaning, but while they are inside the airplane as well. And it reinforces our view that Congress meant and still means handicapped persons to be free from discrimination whenever reasonably possible--not merely when, in the special context of air transportation, handicapped passengers happen to fly a small subsidized airline to a remote town, or are lucky enough to find a large carrier treating them fairly out of courtesy.
 
 B. The Substance of the Rules
 
 87
 As we have already indicated, the record in this case suggests that in its promulgation of specific, substantive regulations the CAB worked conscientiously and, in an area characterized by great individual variability and acute sensitivity, managed reasonably to resolve many difficult problems.[177] This characterization applies equally to the Board's promulgation of the two specific sections of the substantive regulations that petitioners challenge here.[178] However, because certain aspects of the challenged Rule would have been drafted differently if the Board had properly construed the scope of its rulemaking authority under section 504, we remand the regulations in part for reconsideration in light of today's holding.
 
 
 88
 1. The Definition of "Qualified Handicapped Person"
 
 
 89
 Under the CAB's final regulations, only a "qualified handicapped person" is protected by section 504.[179] The statute itself uses the term "otherwise qualified handicapped individual,"[180] which the Supreme Court has defined as "one who is able to meet all of a program's requirements in spite of his handicap."[181]
 
 
 90
 In the context of air transportation, the Board's regulation now defines such an individual as a handicapped[182] person
 
 
 91
 (1) Who tenders payment for air transportation;
 
 
 92
 (2) Whose carriage will not violate the requirements of the Federal Aviation Regulations, ... or, in the reasonable expectation of carrier personnel ..., jeopardize the safe completion of the flight or the health or safety of other persons; and
 
 
 93
 (3) Who is willing and able to comply with reasonable requests of the airline personnel or, if not, is accompanied by a responsible adult passenger who can ensure that the requests are complied with. A request will not be considered reasonable if(i) It is inconsistent with this part; or
 
 
 94
 (ii) It is neither safety-related nor necessary for the provision of air transportation.[183]
 
 
 95
 Petitioners contend that by selectively imposing requirements on handicapped persons which are not imposed upon other passengers and prospective passengers, the CAB's definition of "qualified handicapped person" violates section 504. In addition, they argue that the definition lacks objective guidelines or criteria that would limit arbitrary, unreasonable, discriminatory requests or demands by airline personnel.[184]
 
 
 96
 The record reveals, and it is uncontested, that numerous incidents of arbitrary refusals of service and of irrational decisions by airline personnel concerning the qualifications of handicapped individuals have occurred.[185] Unwarranted assumptions and stereotypes have clearly caused airline personnel to discriminate against disabled passengers.[186] Yet, the record suggests that the Board was sensitive to such concerns and others voiced by handicapped individuals and their representatives,[187] and it is far from clear that amending the definition of "qualified handicapped individual" would provide any remedy more meaningful than that provided by the rules as they now exist.
 
 
 97
 Decisions involving safety, especially, require the granting of a certain amount of discretion to airline personnel. Individuals differ considerably, sometimes dramatically, in their abilities as well as in their disabilities. What is an unreasonable or unwarranted request when made of one handicapped person may be perfectly legitimate when made of another. Because of the unique nature of every individual, because of the infinite variety of disabling conditions and the varying extent to which they may handicap a particular person, the vesting of some discretion in airline personnel to make case-by-case determinations is unavoidable. This is especially so where, just as individuals differ, so do airlines and aircraft. A wide-bodied jet may present different safety concerns or space limitations than a smaller jet or a much smaller piston-powered aircraft.[188] In this situation, some discretionary decisionmaking on the part of airline personnel is inevitable.
 
 
 98
 The risk that arbitrary or irrational decisions may occasionally be made, of course, follows the grant of decisional discretion as night follows the day. The final regulations promulgated by the CAB, however, have significantly limited the discretion of airline personnel.[189] For example, section 382.13(a) of the Final Rule creates a presumption that every handicapped person is a "qualified handicapped person unless a carrier has a reasonable, specific basis for doubting those qualifications."[190] Moreover,
 
 
 99
 A carrier shall not refuse transportation to the handicapped person unless an agency or employee designated by the carrier to make such determinations and familiar with the carrier's standards and procedures for such determinations reasonably believes on the basis of available information, including any presented by the handicapped person, that the person is not a qualified handicapped person.[191]
 
 
 100
 Section 382.13(e) requires that "[t]he name of the employee designated by the carrier to refuse service or require an attendant ... shall be made known to ticket and reservation agents, who shall inform any person who requests that name."[192] From the outset, any request made of a handicapped person must be reasonable and either "safety related" or "necessary for the provision of air transportation."[193] And, of course, no carrier may "[e]xclude a qualified handicapped person from or deny that person the benefit of any air transportation or related services that are available to other passengers...."[194]
 
 
 101
 Thus, we are not presented with a case of unbridled discretion but instead with a situation where discretionary, case-by-case decisions are mandatory. We are not presented with a case involving relatively unambiguous distinctions based upon gender or race but instead with the endless complexities of handicapping conditions. And we are not presented with regulations applying to any service--or even any transportation--industry but to a unique industry that carries its clients tens of thousands of feet above the earth at hundreds of miles per hour. Safety and "air transportation" requirements go to the very essence of commercial aviation and must be applied not only to handicapped persons but to all passengers.[195] In its efforts to do so without discrimination, the Board sought to define "qualified handicapped person" in a manner that "removes the subjective aspects of the standard to the maximum extent possible consistent with our need to defer in the first instance to the reasonable judgment of carrier personnel on safety questions."[196] In that regard, it has succeeded. We surely cannot say that "the agency's decision ... manifests a clear error in judgment,"[197] or that the definition challenged here in any way lacked "a rational basis."[198] Accordingly, petitioners' challenge to the definition is denied. If arbitrary or unreasonable decisions do occur under that definition or the regulations to which it applies, the remedy lies in enforcement proceedings or other corrective action under Subpart C of the Rule.[199]
 
 2. The Forty-Eight Hour Notice Requirement
 
 102
 Section 382.15(c) of the CAB's final regulations permits airlines to require all handicapped passengers who will need "extensive special assistance" to notify the airline forty-eight hours in advance of their flight.[200] "Extensive special assistance" was defined in the Final Rule as including:
 
 
 103
 (1) Medical oxygen for on-board use;
 
 
 104
 (2) Boarding and deplaning assistance using mechanical boarding lifts, aisle chairs, other special equipment, or requiring the presence of more than the usual complement of personnel; and
 
 
 105
 (3) Ground wheelchairs at facilities where they are not usually available.[201]
 
 
 106
 In response to further comment from groups representing the handicapped, the Board amended its Final Rule to prohibit carriers from refusing assistance "on the ground of inadequate notice if the service or equipment is available with the lesser notice given."[202] Petitioners nevertheless challenge the forty-eight hour notice requirement as arbitrary, overbroad, discriminatory and inconsistent with the mandate of section 504.[203]
 
 
 107
 We disagree. Here again, a balance must be struck between furthering the nondiscriminatory purposes of section 504 and allowing for the practicalities of providing special assistance. As we have noted, the Supreme Court (in the context of education) and this court (in the context of urban mass transportation) have held that extensive, extremely expensive modifications of existing programs may impose such substantial affirmative burdens that they cannot be required under section 504.[204] The record reveals that with respect to its advance notice rule, as elsewhere, the Board conscientiously and rationally sought to implement section 504 in a manner likely to be reasonable and effective.[205] As a reviewing court, we can require no more.[206]
 
 
 108
 Nevertheless, it is clear that when the CAB fashioned this rule, the Board was assuming its application primarily to small air carriers--those least likely to be able to provide special assistance without suffering a substantial financial burden.[207] It conceded that "some carriers now provide such services on 24 hours' notice," but argued that "many, especially smaller carriers, may not be able to do so."[208] Respondents expand upon this point by noting the
 
 
 109
 undue burdens for small airlines operating at small airports or airfields where facilities and equipment are extremely limited. For example, if an airline operates between a number of small facilities that do not receive Federal financial assistance and do not provide ground wheelchairs, it should not be required to maintain a wheelchair at each airport.[209]
 
 
 110
 If such reasoning formed the basis of the forty-eight hour notice requirement below, that requirement will, of course, need to be reconsidered on remand. Under our holding today, such small carriers will be a minority of the carriers subject to the regulations implementing section 504. Should the rule be redrafted in accordance, for example, with the comments regarding notice requirements made by both the Architectural and Transportation Barriers Compliance Board[210] and the Department of Transportation,[211] an exemption may need to be provided for the small carriers.
 
 3. The Rule on Remand
 
 111
 The Airline Deregulation Act of 1978 provided for the sunset of the Civil Aeronautics Board and the transfer to other agencies, effective January 1, 1985, of those CAB functions that are to continue.[212] As specified further by the Civil Aeronautics Board Sunset Act of 1984, the vast majority of functions performed by the Board before it ceased to exist have been transferred to the Department of Transportation.[213] Among these transferred functions--and substantial enough in the consideration of Congress to have been one of sixteen prominently captioned sections--was the furtherance of "the accessibility of commercial airports or commercial air transportation" to handicapped persons."[214] On account of our holding today, vacating the CAB's restrictive reading of its rule-making authority and ordering any regulations promulgated under section 504 to be applied to essentially all air carriers, the DOT will have an opportunity, on remand, to fashion a Nondiscrimination Rule that is consistent with its current regulation of airports, its own understanding of the CAB's regulatory authority over air carriers as expressed throughout these proceedings, and the intent of Congress.[215]
 
 
 112
 On remand we expect the DOT to act with expedition. We have affirmed the specific provisions of the CAB's regulations challenged by petitioners. The Department may, as we have indicated, wish to take another look at certain aspects of the Final Rule that appear to have been drafted with small carriers in mind. It may wish then to specify certain exemptions for such carriers if changes are made to reflect the wider applicability of the rules to this nation's major commercial airlines. Certainly the Department will need to make some non-substantive deletions of language, and it may wish otherwise to economize editorially. By now, however, a dozen years have passed since Congress enacted section 504.[216] It is time that a handicapped person's right of reasonable access to nondiscriminatory commercial air transportation had the force of law.
 
 III. CONCLUSION
 
 113
 The regulations promulgated by the Civil Aeronautics Board to implement section 504 of the Rehabilitation Act of 1973 are vacated with respect to the Board's determination that they could be applied only to air carriers receiving direct money subsidies from the federal government.[217] They are affirmed in all other respects, but remanded to the Board's successor agency, the Department of Transportation, with orders to redraft the rules to the extent necessary to apply them to all commercial air carriers in a manner not inconsistent with this opinion.
 
 
 114
 So ordered.
 
 
 115
 ON RESPONDENTS' SUGGESTION FOR REHEARING EN BANC
 
 
 116
 Before ROBINSON, Chief Judge, and WRIGHT, TAMM, WALD, MIKVA, EDWARDS, GINSBURG, BORK, SCALIA and STARR, Circuit Judges.
 
 
 117
 PER CURIAM.
 
 
 118
 Respondents' suggestion for rehearing en banc has been transmitted to the full Court. A majority of the judges of the Court in regular active service have not voted in favor thereof. Upon consideration of the foregoing, it is
 
 
 119
 ORDERED, by the Court en banc, that the suggestion is denied.
 
 
 120
 A dissenting opinion filed by Circuit Judge BORK is attached and is joined by Circuit Judges SCALIA and STARR.
 
 
 121
 BORK, Circuit Judge, with whom Circuit Judges SCALIA and STARR join, dissenting:
 
 
 122
 The panel opinion in this case conflicts with the Supreme Court's decision in Grove City College v. Bell, --- U.S. ----, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). For that reason, this case should be reheard en banc.
 
 
 123
 In a final rulemaking, the Civil Aeronautics Board ("CAB") determined that only those airlines receiving a direct subsidy under the Federal Aviation Act are federally assisted within the meaning of section 504 of the Rehabilitation Act, 29 U.S.C. Sec. 794 (1982). This court held, however, that all activities of commercial airlines are federally assisted programs or activities because the airlines make use of airports that accept federal funds under the Airport and Airway Improvement Act of 1982. Thus, all airlines, regardless of whether they receive direct federal assistance, are subject to section 504. The court vacated CAB's rulemaking and ordered CAB to promulgate regulations pursuant to section 504 to be applied to all airlines. Airlines are transformed into "recipients" of federal assistance, according to the panel, because airports and the facilities are "inextricably intertwined" with and "indispensable" to air travel. Paralyzed Veterans of America v. CAB, 752 F.2d 694, 712, 715 (D.C. Cir. 1985).
 
 
 124
 This reading of section 504's statutory language would make every commercial enterprise a "recipient" of federal aid when it merely makes use of a service or facility that receives any federal assistance. That idea has great potential. Trucking and bus companies use federally constructed and maintained highways, and their businesses are thus inextricably intertwined with a federally assisted program. Many electric companies rely on dams constructed and maintained with federal funds. Without the National Weather Service farmers would be unable to plan, protect, and cultivate their crops in an effective manner. It ought surely to be true that federal funding of federal courts results in the regulation of law firms since courts are inextricably intertwined with and indispensable to lawyering.
 
 
 125
 It is clear that the panel has not followed the decisions in Grove City and North Haven Board of Education v. Bell, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). These decisions are especially apposite because they interpret civil rights legislation upon which section 504 was modeled. As the panel opinion recognized, "courts have duly noted the extent to which the language of [section 504 of the Act] corresponds to that of Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, frequently applying the case law developed in those areas to the resolution of problems arising under the Rehabilitation Act." 752 F.2d at 707 (footnotes omitted.[1]
 
 
 126
 In North Haven, the Court concluded that Title IX's reach is limited by its "program-specific" language. The Court rejected an institution-wide approach, as inconsistent with the language and legislative history of the statute. 456 U.S. at 536-38, 102 S.Ct. at 1926-27.
 
 
 127
 In Grove City, the Court again rejected the institution-wide approach and defined "program or activity" by limiting coverage of Title IX to only those "programs or activities" specifically funded by the federal government, even if those programs were part of a larger whole. 104 S. Ct. at 1220-21. The Court held, therefore, that tuition grants to students did not allow the grant agencies under Title IX to regulate all programs at the school. The purpose of tuition grants is to assist the school's financial aid program and that is the only program considered to have received federal funds under Title IX. Id. at 1221. Under Grove City, the airlines here are clearly not "recipients" of federal funds. The airports are, and the ground activities of the airlines integral to the operation of the airport may be, subject to section 504. However, the non-airport activities of the airlines, such as in-flight procedures, are outside the scope of that section.[2]
 
 
 128
 The panel's attempts to distinguish this case from Grove City are wholly unpersuasive. It would unduly extend this dissent, however, to deal with those contentions in detail. The Supreme Court has been over this ground, and we ought to accept, rather than evade, its conclusion.
 
 
 129
 I would grant the petition.
 
 
 
 [1]
 Joining PVA as petitioners in this case are the American Coalition of Citizens with Disabilities, Inc., a nationwide coalition of 127 organizations representing all major disability groups, and the American Council of the Blind. PVA is comprised of veterans of the United States Armed Forces who have suffered spinal cord injury or disease
 
 
 [2]
 Joining respondent CAB in this case are the Federal Aviation Administration and the United States Department of Transportation. Intervenor in this case on behalf of respondents is the Regional Airline Association, the trade association of the regional/commuter air carrier industry, representing approximately 130 airline members. Because the CAB ceased operations on December 31, 1984, pursuant to the Airline Deregulation Act of 1978 and the Civil Aeronautics Board Sunset Act of 1984, see infra notes 212-214 and accompanying text, references in this opinion to the CAB or Board should be construed, where appropriate, to include the CAB's successor agency, the Department of Transportation
 
 
 [3]
 Rehabilitation Act of 1973, Pub.L. No. 93-112, Sec. 504, 87 Stat. 355, 394 (codified as amended at 29 U.S.C. Sec. 794 (Supp. V 1981)). Title V of the Act also required federal agencies and federal contractors undertaking contracts in excess of $2,500 to take affirmative action to employ handicapped individuals. Sections 501, 503, 29 U.S.C. Sec. 791. In addition, and of considerable relevance to the case before us, see infra notes 150, 154, 174 and accompanying text, section 502 established the Architectural and Transportation Barriers Compliance Board in an effort to lower the "architectural, transportation and attitudinal barriers" confronting handicapped citizens. 29 U.S.C. Sec. 792 (emphasis added)
 
 
 [4]
 See Wegner, The Antidiscrimination Model Reconsidered: Ensuring Equal Opportunity Without Respect to Handicap Under Section 504 of the Rehabilitation Act of 1973, 69 CORNELL L.REV. 401, 411-12 (1984)
 
 
 [5]
 Exec.Order No. 11,914, 41 Fed.Reg. 17,871 (1976)
 
 
 [6]
 Cherry v. Mathews, 419 F.Supp. 922 (D.D.C.1976). The court found "that Congress contemplated swift implementation of Sec. 504 through a comprehensive set of regulations." Id. at 927
 
 
 [7]
 See 42 Fed.Reg. 22, 676 (1977); see also Note, Ending Discrimination Against the Handicapped or Creating New Problems? The HEW Rules and Regulations Implementing Section 504 of the Rehabilitation Act of 1973, 6 FORDHAM URB.L.J. 399 (1978); Note, Administrative Action to End Discrimination Based on Handicap: HEW's Section 504 Regulations, 16 HARV.J. ON LEGIS. 59 (1979)
 
 
 [8]
 Implementation of Executive Order 11,914, Nondiscrimination on the Basis of Handicap in Federally Assisted Programs, 43 Fed.Reg. 2132, 2137 (1978) (codified at 45 C.F.R. Sec. 85 (1982)). When Congress divided HEW into two new agencies in 1979, both the Department of Education and the Department of Health and Human Services (HHS) republished regulations implementing section 504 within the agencies themselves. Authority for coordinating the implementation and enforcement of section 504 throughout the executive branch was transferred first to HHS, then to the Department of Justice, where it currently resides. See C.F.R. Sec. 41 (1982) (guidelines published by Department of Justice pursuant to Exec.Order No. 12,250, 3 C.F.R. 298 (1981)). The original guidelines promulgated by HEW to assist other agencies in implementing section 504 are now deemed to have been issued by the Attorney General and it is clear, as one commentator has noted, that "[i]n the future the Department of Justice will play a leading role in the interpretation of Sec. 504." Wegner, supra note 4, at 417 n. 42
 
 
 [9]
 Notice of Proposed Rulemaking, Part 382, Nondiscrimination on the Basis of Handicap, 44 Fed.Reg. 32,401 (1979) [hereinafter cited as Proposed Rule]
 
 
 [10]
 Id
 
 
 [11]
 Id
 
 
 [12]
 As the proceedings continued, further prompting was apparently necessary before the Board would adopt final rules. In addition to Secretary Califano's letter of January 29, 1979 urging the CAB to give the matter a high priority, the Board's slow pace elicited a formal request from the White House in November, 1980 that the CAB's section 504 obligations be fulfilled. "When the CAB still had not issued final rules by July 2, 1981, a district court ordered the agency to inform all of its subsidized carriers of their obligation to comply with the requirements of Section 504. Paralyzed Veterans of America, et al. v. William French Smith, et al., No. 79-1979 (C.D.Cal. July 2, 1981). The CAB complied with this order by sending a letter on June 12, 1981 to all carriers receiving federal payments under Section 419 of the Federal Aviation Act." Petitioner's Brief at 7 n. 4 [hereinafter cited as PVA Brief]
 
 
 [13]
 Proposed Rule, 44 Fed.Reg. 32,401 at 32,402
 
 
 [14]
 Id. at 32,401-02
 
 
 [15]
 Id. at 32,402
 
 
 [16]
 Id
 
 
 [17]
 Id. Some implications of this limitation pertaining to recent case law in this area are discussed infra at note 155
 
 
 [18]
 Id
 
 
 [19]
 Id
 
 
 [20]
 Id. at 32,402-03
 
 
 [21]
 Id. at 32,405
 
 
 [22]
 Id
 
 
 [23]
 Id. at 32,406
 
 
 [24]
 Id. Section 382.5(a) permits different or separate service if "reasonably necessary to provide a qualified handicapped person with access to air transportation or related services or if requested by such a person." Section 382.5(b) permits carriers to deny transportation or services available to other passengers if "such action is reasonably necessary to accommodate the handicapped passenger in order to comply with the conditions for air transportation." Id
 
 
 [25]
 In this Notice of Proposed Rulemaking, the CAB defined "carrier" as including "(1) any holder of a certificate of public convenience and necessity issued by the Board authorizing the transportation of passengers, and (2) any air taxi operator" using aircraft seating more than thirty passengers. Although the Notice was explicit about its applicability "to all certificated carriers," i.e., major commercial airlines, it specifically invited comment on the subject of commuter carriers; indeed, it included language for an alternative regulation that would not routinely exempt aircraft with fewer than thirty seats. Id. at 32,405
 
 
 [26]
 To be "qualified," a handicapped person was required to satisfy these conditions, defined as:
 the tender of payment for air transportation, the absence of any indication that air transportation of the passenger will jeopardize flight safety, and the absence of any indication that the passenger is unwilling or unable to comply with reasonable requests of airline personnel. Any request of airline personnel that is inconsistent with this part will not be considered reasonable for the purposes of this definition.
 Id.
 
 
 [27]
 " 'Facility' means all or any portion of a carrier's aircraft, buildings, structures, equipment, roads, walks, parking lots, and other real or personal property, normally used by passengers or prospective passengers, or interest in such property." Id
 
 
 [28]
 " 'Handicapped person' means a person who (i) has a physical or mental impairment that substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." Id
 
 
 [29]
 " 'Qualified handicapped person' means a handicapped person who has satisfied all the conditions for receiving air transportation services ('conditions for air transportation') that are required for the non-handicapped." Id. at 32,405-06
 
 
 [30]
 As to accessibility, Sec. 382.10 did not require "that every facility or every part of the facilities for each flight be made accessible to or usable by handicapped persons," but did mandate that "[e]ach carrier's facilities and services, when viewed in their entirety, shall be reasonably accessible to and usable by handicapped persons." Id. at 32,406
 
 
 [31]
 Paragraph (a) of Sec. 382.11 required that carriers "establish a method for ensuring that deaf passengers receive necessary information in emergencies" and that necessary information be provided "in a timely manner ... by use of written material, signs, placards, flashing signal lights, or other means." Id. Paragraph (b) provided that any information available to passengers on printed emergency cards must also be made available to blind passengers in Braille. Id
 
 
 [32]
 Appropriately, the "refusal of service" regulations of Sec. 382.12 were the most lengthy and detailed of any in the Notice. Although they explicitly granted carriers the right to refuse transportation to "handicapped persons who are intoxicated by alcohol or drugs, who are seriously ill with a condition that may require immediate treatment, who have a contagious disease, who would endanger flight safety, or whose condition results in disruptive behavior by the handicapped person," Sec. 382.12(a), they equally explicitly established the following presumption and elaborated upon its proper application in practice:
 Handicapped persons shall be presumed to meet all conditions for the provision of air transportation. A carrier shall not refuse transportation to a handicapped person in accordance with this paragraph unless it reasonably believes that the person does not meet those conditions. If the handicapped person presents a medical certificate from a licensed physician that the person is eligible for air transportation, a carrier shall not refuse transportation without compelling evidence to the contrary.
 Id.
 Paragraph (b) of Sec. 382.12 permitted carriers to require that a personal nurse or attendant accompany "a handicapped person who needs extraordinary care during flight" or who "would need substantial assistance to deplane in an emergency" or who would necessarily, because of the aircraft's structure, "obstruct the emergency deplaning of other passengers." The paragraph pointedly provided, however, that a carrier "shall not require persons who are blind or deaf but not both, or persons who are unable to walk but who can deplane reasonably expeditiously in an emergency by using their arms, to have attendants for that reason." Id.
 
 
 [33]
 Blind and deaf passengers were permitted by Sec. 382.13, "Guide dogs and personal equipment," to be accompanied on aircraft by guide dogs, and to use canes or crutches and "to keep those aides near them at all times." Paragraph (c) of Sec. 382.13 further required carriers to permit handicapped persons to take folding wheelchairs aboard and to stow the wheelchairs in the passenger compartment, and paragraph (d) required carriers to "accept as baggage battery-powered wheelchairs and personal oxygen supplies of handicapped passengers" to the extent that such storage and baggage-carrying did not violate Federal Aviation Regulations or Department of Transportation regulations for the transportation of hazardous materials (49 C.F.R. Parts 172, 173, and 175). Id
 
 
 [34]
 See supra note 31
 
 
 [35]
 According to Sec. 382.12(c):
 A carrier shall not refuse transportation to, or require attendants for, persons because they are unable to feed themselves, if they elect not to eat during the flight. A carrier shall not refuse transportation to or require attendants for, persons because they are incontinent or persons who are unable to use the restrooms without assistance, if they have made adequate alternative arrangements for waste disposal.
 Id.
 
 
 [36]
 Exceptions to these prohibitions were contained in Sec. 382.15(b), which permitted carriers to "insist upon a waiver of liability for injury that: (1) Results from a handicap traveling with which presents an extraordinary hazard, and (2) Occurs despite the exercise of due care by the carrier." Id. at 32,407
 
 
 [37]
 Id. at 32,406. Additional paragraphs of Sec. 382.14 permitted carriers to charge handicapped passengers "the costs of the assistance including a reasonable profit," Sec. 382.14(c), and enjoined carriers from forcing special assistance upon a handicapped person "who does not request it, unless the assistance is reasonably necessary to physically accommodate the passenger or to enable the passenger to meet the conditions for air transportation," Sec. 382.14(d). Id. Supplementing Sec. 382.14's definition of "extensive special assistance," the Subpart B guidelines on "refusal of service" provided in Sec. 382.12(d) as follows:
 A carrier may refuse transportation to a person who will need extensive special assistance from the carrier, such as the provision of wheelchairs, oxygen, or mechanical boarding lifts, if the person fails to comply with advance notice requirements established by the carrier in accordance with Sec. 382.14(b).
 Id.
 
 
 [38]
 Id. at 32,407 (Sec. 382.20)
 
 
 [39]
 Id. (Sec. 382.21)
 
 
 [40]
 Id. (Sec. 382.23)
 
 
 [41]
 Id. (Sec. 382.22)
 
 
 [42]
 Id
 
 
 [43]
 Id. (Sec. 382.24)
 
 
 [44]
 Id. (Sec. 382.25)
 
 
 [45]
 Id. (Sec. 382.26)
 
 
 [46]
 Additional groups included the National Association of the Deaf, the National Capital Chapter of the National Multiple Sclerosis Society, the Disability Rights Center, the National Center for Law and the Deaf, and the National Association for Retarded Citizens
 
 
 [47]
 American Airlines argued, for example, that "[t]he FAA currently enforces its own regulations regarding accommodating handicapped travelers. These regulations are both comprehensive and reasonable. There is no need, therefore, for the Board to involve itself in duplicating the efforts of the FAA, particularly when it lacks the FAA's technical expertise." Comments of American Airlines, Inc. before the Civil Aeronautics Board, Aug. 31, 1971, J.A. at 154, 156; see also Respondents' Brief at 10
 
 
 [48]
 Comments of Pacific Southwest Airlines before the Civil Aeronautics Board, Sept. 4, 1979, J.A. at 137, 139
 
 
 [49]
 Comments of Commuter Airline Association of America, Inc. before the Civil Aeronautics Board, Sept. 4, 1979, J.A. at 98, 102
 
 
 [50]
 Nondiscrimination on the Basis of Handicap, Final Rule, 47 Fed.Reg. 25,936 (1982) (codified at 14 C.F.R. Part 382) [hereinafter cited as Final Rule]
 
 
 [51]
 See, e.g., Comments of PVA before the Civil Aeronautics Board, Sept. 5, 1979, J.A. at 83, 85 (citing the increasing frequency of such flights, noting their importance in making mid-route connections, and arguing that "[a]t most, these carriers should be individually and temporarily exempted"); regarding the CAB's concern on this score see note 25, supra
 
 
 [52]
 These included the three petitioners in this case and the groups enumerated in note 46 supra
 
 
 [53]
 See J.A. at 111; Final Rule, 47 Fed.Reg. at 25,937
 
 
 [54]
 See supra note 32
 
 
 [55]
 Final Rule, 47 Fed.Reg. at 25,942 (discussing proposed Sec. 382.12 (now Sec. 382.13))
 
 
 [56]
 Id
 
 
 [57]
 Id
 
 
 [58]
 See supra note 31
 
 
 [59]
 Final Rule, 47 Fed.Reg. at 25,941
 
 
 [60]
 Id. at 25,940
 
 
 [61]
 "The question of whether a blind person may have his cane during flight," according to a "Fact Sheet" submitted to the Board by the National Federation of the Blind, "is no exception to th[e] chaotic configuration of procedures and practices by the airlines." Noting that many airlines treated canes as any other carry-on baggage to be stowed at the discretion of the carrier, the Federation noted that "[t]he white cane is of functional necessity to its owners just as the guidedog is inextricably bound to its master," placing it "entirely out of the category of portable hardware when it comes to the importance that the white cane holds for blind persons. The white cane represents one of two full-proof methods of independent travel for the blind, and is therefore symbolic of the mobility and self-sufficiency which blind people strive for. Stowing a blind person's cane in some far-off closet is not like doing so to another person's extra clothes bag." J.A. at 174
 On this subject, the Board, in explaining its Final Rule, noted that the "primary authority" on the matter was the Federal Aviation Administration [FAA], which "has considered the air safety implications" [45 Fed.Reg. 75,138 (1980) ] and "determined that the stowage of travel canes under passenger seats is consistent with its safety mandate provided that the cane is placed flat on the floor and does not protrude into an aisle or exit row." The Board therefore amended its Final Rule Sec. 382.14[b] to require carriers to permit stowage of travel canes whenever the FAA's conditions can be met. Final Rule, 47 Fed.Reg. at 25,943-44.
 
 
 [62]
 The proposed rules would have required airlines to carry folding wheelchairs in the passenger compartment if permissible under FAA and Department of Transportation [DOT] regulations--a proposal that was warmly embraced by commenters representing the handicapped and strongly criticized by the airlines, flight attendants' unions, and the Aerospace Industries Association. The critics contended that passenger-area storage space was too limited and that folding wheelchairs could be "doortagged" (taken from the passenger and stored in the plane's belly just before boarding and returned just after deplaning). Advocates of the proposed rule, however, argued that chairs were more likely to be damaged by such a procedure and that passenger-compartment stowage was much less uncomfortable because it permitted use of a personal chair for the longest possible time. Id. at 25,944
 In its Final Rule, the CAB decided "that airlines need more flexibility" and modified its proposed rule "to require carriers to make reasonable efforts to provide passenger-area storage, and otherwise to doortag," stating its expectation that airlines would make "good faith efforts to accommodate folding wheelchairs in the passenger compartment when possible." Id. On the other hand, the Board refused to cede to the airlines' request that it further relax its proposed Sec. 382.13(d), which required airlines to carry battery-operated wheelchairs in the baggage compartment to the extent permitted by DOT rules on the carriage of hazardous materials. It noted that any need for more flexibility here was offset by the "strong countervailing interest" of the handicapped traveler's access to such "extremely important belongings." Id.
 
 
 [63]
 A final illustration involves paragraphs (b) and (c) of proposed Sec. 382.12 (now Sec. 382.13), which permitted airlines to require handicapped passengers to travel with attendants when nursing or other extensive personal care would be necessary during flight and when a passenger would require assistance to exit during an emergency. Responding to comments seeking greater specificity in the rules, the Board in its Final Rule sought to "make clear that minor assistance with meals, such as opening silverware packages or telling a blind passenger what is being served and where each item is located on the tray, should not be considered feeding assistance requiring a passenger to travel attended or forego food." Id. at 25,942. Otherwise the Board relied on what it in another context termed the airlines' "courtesy and common sense." Id. at 25,941. Thus:
 The normal range of flight attendant services, including the occasional modest extra efforts provided for some passengers--escorting them to seats, providing games to restless children, soothing first-flight anxieties--can be easily distinguished from the kind of time-consuming attention or specialized services (such as administering injections or assisting a passenger in the lavatory) that passengers would not expect as a matter of course.
 Id. at 25,942.
 As to the requirement of an attendant when necessary for emergency deplaning, the Board concluded that airlines should be permitted to require this "substantial logistical and financial barrier to travel," id., only "when reasonably necessary for the safety of other passengers, in accordance with the regulations and policies of the FAA." Id. at 25,94 3. Noting that the FAA had still not resolved the question to its own satisfaction, but had found in a preliminary study that " 'the potential for handicapped passengers delaying aircraft evacuations would appear minimal,' " the Board concluded that
 [a]s with decisions on refusing service, decisions requiring attendants must be made by designated personnel. The name of the designated person must be made known to any person that requests it. Additionally, we will expect airlines to be able to provide specific justifications for their determinations that safety requires a passenger to be attended.
 Id.
 
 
 [64]
 PVA Brief at 51. When its Final Rule was published, the Board noted that "[i]n order to aid in any revisions or analysis that may be necessary, we are leaving this rulemaking docket open for further comments on possible changes ...." 42 Fed.Reg. at 25,948. Such comments were in fact received from the Department of Justice and several groups representing the handicapped, resulting in some minor changes discussed infra at note 179. The amendments, characterized by the CAB as "interpretative" and promulgated without notice or public comment, were published on November 18, 1982. Nondiscrimination on the Basis of Handicap, Amendment No. 1 to Part 382, 47 Fed.Reg. 51,857 (1982) [hereinafter cited as Amended Final Rule]
 
 
 [65]
 PVA Brief at 60; see Final Rule, 47 Fed.Reg. at 25,949
 
 
 [66]
 PVA Brief at 61-62
 
 
 [67]
 See supra notes 9-20 and accompanying text
 
 
 [68]
 Proposed Rule, 44 Fed.Reg. 32, 401-02
 
 
 [69]
 See supra notes 14-17 and accompanying text. "The Board did not propose provisions governing employment because it did not consider employment to be covered by Section 504 .... A recent decision by the Supreme Court, North Haven Board of Education v. Bell [456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) ] ..., however, caused the Board to reverse this view." Final Rule, 47 Fed.Reg. at 25,947
 
 
 [70]
 See supra note 17 and accompanying text
 
 
 [71]
 See supra notes 18 and 25 and accompanying text
 
 
 [72]
 Final Rule, 47 Fed.Reg. at 25,937
 
 
 [73]
 Id. at 25,937-38
 
 
 [74]
 29 U.S.C. Sec. 794 (Supp. V 1981)
 
 
 [75]
 Final Rule, 47 Fed.Reg. at 25,937
 
 
 [76]
 At the time this petition for review was filed, three carriers were so subsidized: Frontier Airlines, Piedmont Airlines, and Republic Airlines. Under the original section 406 program of the Federal Aviation Act, certain airlines were compensated by the federal government for the transportation of mail. See 49 U.S.C. Sec. 1376(c), as amended (Supp. V 1981). This program was supplanted by a more limited program in 1982 (shortly after the CAB's Final Rules were promulgated) as part of the congressional plan to "deregulate" air transport and to "sunset" the CAB. See PVA Brief at 10; see also infra notes 212, 213 and accompanying text
 
 
 [77]
 Under the section 419 program, airlines providing essential air service to a small community received federal subsidies under sections 419(a)(5) or (b)(6) of the Federal Aviation Act. In its Final Rule, the CAB noted that these small local and regional carriers would be required to comply with Subparts B and C of the nondiscrimination rule. In addition to the three carriers noted in note 76, supra, the Board identified Ozark, Air Midwest, Skywest, Alaska Airlines, Wien Air Alaska and Kodiak Western as carriers which, by virtue of their receipt of federal subsidies, would be subject to the specific requirements and compliance provisions of the rule. Final Rule, 47 Fed.Reg. at 25,938
 Curiously, the CAB elected not to apply Subparts B and C to air carriers receiving compensation retroactively for losses incurred when they have been required to continue providing services which they have requested authority to terminate. Such retroactive compensation, pursuant to section 419(a)(7), was deemed "short term and after-the-fact," making compliance "impractical." Id. By contrast, the Department of Justice's Civil Rights Division believed the retroactivity of the compensation did not justify different treatment of such carriers. See J.A. at 59; PVA Brief at 11.
 
 
 [78]
 Examples of major commercial air carriers that have no legal obligation to comply with Subparts B and C, in the Board's view, are American, Delta, Eastern, Northwest, Pan American, Trans World, and United Airlines
 
 
 [79]
 See, e.g., PVA Brief at 19
 
 
 [80]
 See supra notes 64-66 and accompanying text
 
 
 [81]
 PVA Brief at 12
 
 
 [82]
 Jurisdiction in this case is provided by 49 U.S.C. Sec. 1486(a) (1976):
 Any order ... issued by the Board ... shall be subject to review by the court ... upon petition, filed within sixty days after the entry of such order, .... After the expiration of said sixty days a petition may be filed only by leave of court upon a showing of reasonable grounds for failure to file the petition theretofore.
 Respondents argue that petitioners' filing for review in this case six months after the CAB's promulgation of its Final Rule precludes judicial review entirely. They suggest, moreover, that the Board's amendments to its Final Rule, which were issued on November 18, 1982 after further comment to the Board from the Department of Justice and disabled citizens, 47 Fed.Reg. 51,857, see infra, notes 179, 202 and accompanying text, were merely interpretive, so that judicial review remains time-barred.
 It is undisputed that petitioners did file for review within sixty days of the Board's promulgation of its Amended Final Rule. More importantly, the CAB explicitly left its rulemaking docket open in order to receive additional comments from the public as well as from the Department of Justice. Final Rule, 47 Fed.Reg. at 25,948. Aware that the rule might be undergoing modification, and unable to predict how extensive any modification would be, petitioners elected to wait until the regulation was in final form before seeking review. Indeed, PVA and other groups representing the handicapped submitted comments to the Board during this period, see supra note 64, and it was entirely reasonable of them to expect the agency to "respond in a reasoned manner to the comments received...." Action on Smoking and Health v. CAB, 699 F.2d 1209, 1216 (D.C.Cir.1983); Rodway v. Department of Agriculture, 514 F.2d 809, 817 (D.C.Cir.1975) (citations omitted). Any delay simply served properly to exhaust petitioners' administrative remedies, and to conserve the resources of both the litigants and this court. Reasonable grounds having been shown, we grant review in this case pursuant to 49 U.S.C. Sec. 1486(a).
 
 
 [83]
 Consolidated Rail Corporation v. Darrone, --- U.S. ----, 104 S.Ct. 1248, 79 L.Ed. 568 (1984)
 
 
 [84]
 See generally White House Conference on Handicapped Individuals Act, Pub.L. 93-651, Sec. 301, 80 Stat. 2 et seq. (1974), 29 U.S.C.A. Sec. 701 (historical note); S.REP. NO. 1297, reprinted in 1974 U.S.CODE CONG. & AD.NEWS at 6406
 
 
 [85]
 Wegner, supra note 4, at 403
 
 
 [86]
 Title VI provides: "No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Civil Rights Act of 1964, Sec. 601, Pub.L. No. 88-352, 78 Stat. 252 (codified at 42 U.S.C. Sec. 2000d (1976); cf. supra text accompanying note 3
 
 
 [87]
 Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ...." Education Amendments of 1972, Pub.L. No. 92-318, Sec. 901(a), 86 Stat. 373 (codified at 20 U.S.C. Sec. 1681(a) (1982))
 
 
 [88]
 See, e.g., Brown v. Sibley, 650 F.2d 760, 767 (5th Cir.1981); see also, Wegner, supra note 4
 
 
 [89]
 The difficult choices necessitated by the idiosyncratic nature and extent of any particular individual's disability and the peculiar requirements of air safety make rulemaking in this area especially delicate, as our review of the background of this case in Part I suggests. Even in the arguably less complicated area of ground transportation, it may be no simple task to determine what section 504's deceptively clear mandate requires:
 What must be done to provide handicapped persons with the same right to utilize mass transportation facilities as other persons? Does each bus have to have special capacity? Must each seat on each bus be removable? Must the bus routes be changed to provide stops at all hospitals, therapy centers and nursing homes? Is it required that buses be able to accommodate bedridden persons? Is it discriminatory to answer any of these questions in the negative? Will the operation of hydraulic lifts on buses involve stigmatizing effects on the persons who use them? If so, is that a discrimination solely by reason of handicap within the meaning of Sec. 504?
 Atlantis Community, Inc. v. Adams, 453 F.Supp. 825, 831 (D.Colo.1978). See also Dopico v. Goldschmidt, 687 F.2d 644, 652 (2d Cir.1982); American Public Transit Ass'n v. Lewis, 655 F.2d 1272, 1281 (D.C.Cir.1981) (Edwards, J., concurring).
 
 
 [90]
 Final Rule, 47 Fed.Reg. at 25,937
 
 
 [91]
 Id
 
 
 [92]
 Gottfried v. Federal Communications Comm'n, 655 F.2d 297 (D.C.Cir.1981), rev'd on other grounds, sub nom. Community Television of S. Cal., 459 U.S. 498, 103 S.Ct. 885, 74 L.Ed.2d 705 (1983)
 
 
 [93]
 The assistance in Gottfried was both indirect ("congressional appropriations channelled ... through ... the Department of Commerce and the Corporation for Public Broadcasting"), id. at 655 F.2d 306, and "more direct and traditional" (restricted program grants to the particular station from particular federal agencies), id. at 307
 
 
 [94]
 Id. at 312
 
 
 [95]
 Id. at 301, 312
 
 
 [96]
 Id. at 312, 313
 
 
 [97]
 Id. at 314 n. 63
 
 
 [98]
 Id. at 314, citing 45 C.F.R. Secs. 84.3(h), 85.3(e) (1979)
 
 
 [99]
 Id. at 314 n. 65 (quoting Nondiscrimination Based on Handicap in Federally Assisted Programs--Implementing Section 504 of the Rehabilitation Act of 1973 and Executive Order 11914, 45 Fed.Reg. 37,620, 37,632 (June 3, 1980))
 
 
 [100]
 This is not to say that broadcast or other federal licenses cannot be of great value. It has been suggested that even twenty years ago television broadcast licenses were worth $1,500,000, see Levin, Economic Effects of Broadcast Licensing, 72 J.POL.ECON. 151 (1964), and it has been argued that granting such a license is the functional equivalent of "Government subsidization of broadcasters," Columbia Broadcasting Syst., Inc. v. Democratic Nat'l Committee, 412 U.S. 94, 174 n. 5, 93 S.Ct. 2080, 2122 n. 5, 36 L.Ed.2d 772 (1973) (Brennan, J., dissenting). Our holding in Gottfried was made in the face of such suggestions and arguments, which are less weighty here, since airline operating certificates are not longer exclusive
 
 
 [101]
 See, e.g., infra notes 144-147 and accompanying text (discussion of Angel v. Pan Am. World Airways, Inc.)
 
 
 [102]
 PVA Brief at 13
 
 
 [103]
 Respondents' Brief at 29
 
 
 [104]
 McGlotten v. Connally, 338 F.Supp. 448, 461 (D.D.C.1972) (three-judge court)
 
 
 [105]
 Id. at 462. McGlotten noted also that the deductibility of charitable contributions to Sec. 501(c)(8) fraternal orders "operates in effect as a Government matching grant," id. (citations omitted) and therefore, like the exemption available to such groups, constitutes a "grant of federal financial assistance." Id. The court concluded that the fraternal organizations in McGlotten, which excluded nonwhites from membership, were subject to Title VI
 
 
 [106]
 McGlotten observed that "the deductions provided in the Code are not all cut from the same cloth. Most relate primarily to the operation of the tax itself, and thus would not constitute a grant of federal financial assistance." Id. at 461. In this case, however, the Code provision is highly specific, relating not to the "tax itself" but to "airline property ... used by the taxpayer directly in connection with ... the furnishing or sale of transportation as a common carrier by air subject to the jurisdiction of the Civil Aeronautics Board or the Federal Aviation Administration." 26 U.S.C. Sec. 46(a)(8)(E) (1976 & Supp. V 1980)
 
 
 [107]
 Respondents' Brief at 29 n. 17. Respondents fail to note that a crucial companion case to Regan prominently credits McGlotten with prompting Congress to enact a Code provision denying tax subsidies to segregated social clubs. Bob Jones Univ. v. United States, 461 U.S. 574, 601 n. 26, 103 S.Ct. 2017, 2033 n. 26, 76 L.Ed.2d 157 (1983) ("Section 501(i) was enacted primarily in response to that decision.")
 
 
 [108]
 We note, for example, that the discussion of charitable exemptions and deductions in Bob Jones emphasizes their historic importance and fundamental nature, and that neither Regan nor Bob Jones discusses any (of the multitude of) Code provisions other than plenary exemptions and deductibility of the sort applied exclusively to non-profit organizations
 
 
 [109]
 In 1983 and 1984 the federal government allocated $2.2 billion and $2.3 billion, respectively, for the operation, installation and maintenance of the air traffic control system. Executive Office of the President, Office of Management and Budget, Appendix to the Budget of the United States Government, 1984 at I-Q27
 
 
 [110]
 See PVA Brief at 14
 
 
 [111]
 Id. at 18
 
 
 [112]
 United States v. Professional Air Traffic Controllers Org., 653 F.2d 1134, 1141 (7th Cir.1981), cert. denied, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981)
 
 
 [113]
 28 C.F.R. Sec. 41.3(e) (1983) (Department of Justice). Most federal agencies construe "federal financial assistance" at least as broadly. See, e.g., 10 C.F.R. Part 1040.3(o) (1984) (Department of Energy); 22 C.F.R. Sec. 142.3(h) (1983) (Department of State); 29 C.F.R. Sec. 32.3 (1983) (Department of Education); 38 C.F.R. Sec. 18.403(h) (1983) (Veterans Administration)
 
 
 [114]
 Respondents' Brief at 25
 
 
 [115]
 Jones v. Metropolitan Atlanta Rapid Transit Auth., 681 F.2d 1376, 1380 (5th Cir.1982), cert. denied, --- U.S. ----, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984); accord, Peyton v. Rowe, 391 U.S. 54, 65, 88 S.Ct. 1549, 1555, 20 L.Ed.2d 426 (1968); Ayers v. Wolfinbarger, 491 F.2d 8, 16 (5th Cir.1974)
 
 
 [116]
 S.REP. NO. 1297, 93d Cong., 2d Sess., reprinted in 1974 U.S.CODE CONG. & AD.NEWS 6373, 6388 (emphasis added); see also S.REP. NO. 1149, 95th Cong., 2d Sess. (1978), reprinted in 1978 U.S.CODE CONG. & AD.NEWS 7312, 7404
 
 
 [117]
 United States v. El Camino Community College Dist., 454 F.Supp. 825, 829 (C.D.Calif.1978), aff'd, 600 F.2d 1278 (9th Cir.1979), cert. denied, 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 642 (1980), citing SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION Sec. 72.05 at 392 (4th ed. 1974) ("To this end, courts favor broad and inclusive application of statutory language by which coverage of legislation to protect and implement civil rights is defined."); see also Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)
 
 
 [118]
 Final Rule, 47 Fed.Reg. at 25,937
 
 
 [119]
 Respondents' Brief at 27, 28 (citations omitted)
 
 
 [120]
 See PVA Reply Brief at 8-11
 
 
 [121]
 See id. Indeed, some recent proposals to substitute a privately owned and operated system of air traffic control would lead, presumably, to just such a result--that is, airlines would contract with and pay for the services of the private program operator(s). The "assistance" provided the airlines in the form of the FAA's flight standards program, however--certifying aircraft, pilot competence, etc.--is more purely regulatory in nature, and therefore more analogous to the Gottfried analysis, see supra at notes 90-101 and accompanying text. To require a private company to acquire a license or adhere to a federal standard, and then to call the costs of regulation and of monitoring compliance a "benefit" to the regulated company which amounts to "financial assistance," would constitute bootstrapping and would exceed the boundaries of liberal statutory construction in the interests even of remedial action and civil rights
 
 
 [122]
 Grove City College v. Bell, --- U.S. ----, 104 S.Ct. 1211, 1217, 79 L.Ed. 516 (1984)
 
 
 [123]
 Id. at 1221
 
 
 [124]
 Id. at 1221, 22. Otherwise, the plurality reasoned, "an entire school would be subject to Title IX merely because one of its students received a small BEOG [Basic Educational Opportunity Grant] or because one of its departments received an earmarked federal grant. This result cannot be squared with Congress' intent ... [W]e have found no persuasive evidence suggesting that Congress intended that the Department's regulatory authority follow federally aided students from classroom to classroom, building to building, or activity to activity." Id
 
 
 [125]
 49 U.S.C. Sec. 1714(a), as amended (1976 & Supp. V 1981)
 
 
 [126]
 49 U.S.C. Sec. 1742, as amended (1976 & Supp. V 1981)
 
 
 [127]
 Between 1982 and 1984 an estimated $17 billion were available for apportionment by the Secretary. Estimates of actual disbursements, consistent with a statutory formula now based, inter alia, upon the number of passengers emplaned at a particular airport, were about one third that amount. See PVA Brief at 17 n. 14; 49 U.S.C.A. Sec. 2206(a)(1) (West Supp.1984) (codifying the Airport and Airway Improvement Act of 1982, Pub.L. 97-248, 96 Stat. 671, Sept. 3, 1982)
 
 
 [128]
 National Transportation Policy Study Commission Final Report, National Transportation Policies Through the Year 2000 (June 1979) at 187-88
 
 
 [129]
 See, e.g., Respondents' Brief at 29, 30 (citing the Title VI regulations of DOT and FAA and DOT's section 504 regulation)
 
 
 [130]
 Id. at 30
 
 
 [131]
 Id. at 30-31
 
 
 [132]
 49 C.F.R. Part 21, Appendix C (1984)
 
 
 [133]
 Nondiscrimination on the Basis of Handicap in Federally-Assisted Programs and Activities Receiving or Benefitting from Federal Financial Assistance, 44 Fed.Reg. 31,442, 31,451 (May 31, 1979) [hereinafter cited as DOT Section 504 Rules]
 
 
 [134]
 Id. at 31,451 (emphasis added)
 
 
 [135]
 See supra note 35; Proposed Rule, 44 Fed.Reg. at 32,405. Commenting in this regard on the CAB's proposed section 504 rules, DOT urged the more inclusive coverage: "We do not believe application of Part 382 should be limited .... DOT believes that handicapped travelers should not be deprived of air transportation [on planes of less than 30 seats], unless a carrier can show that, because of aircraft structure restrictions, certain types of handicapped passengers cannot be safely accommodated." Comments of the U.S. Department of Transportation before the Civil Aeronautics Board at 4, 5 (Sept. 13, 1979), J.A. 78, 79
 
 
 [136]
 14 C.F.R. Sec. 379.2 (1983)
 
 
 [137]
 456 U.S. at 538, 102 S.Ct. at 1926
 
 
 [138]
 Respondents' Brief at 32
 
 
 [139]
 --- U.S. ----, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984)
 
 
 [140]
 456 U.S. at 540, 102 S.Ct. at 1927
 
 
 [141]
 104 S.Ct. at 1221, 23
 
 
 [142]
 For example, as the Board itself has observed, at some airports "a single airline may have its own terminal building" and substantial parts of the airport's physical plant may be "carrier-owned." In other cases "the design of most of the facilities, perhaps even including parking facilities, may well be under the airlines' control [including control "over their selection, design, construction or alteration"], even if the property is leased from an airline authority." Final Rule, 47 Fed.Reg. at 25,940. Especially in the case of the larger, most widely used airports and air carriers, the structural, and a fortiori the functional, integration of airport and air carrier is self-evident. As has been noted, "in the airline industry, two inputs (airline services and airport services) are required to produce a single output (air transportation)." Note, Airline Deregulation and Airport Regulation, 93 YALE L.J. 319 n. 1 (1983). See also the Board's initial definition of "facility" in its Proposed Rule, supra note 27
 
 
 [143]
 Respondents' Brief at 30
 
 
 [144]
 Angel v. Pan Am. World Airways, Inc., 519 F.Supp. 1173, 1178 (D.D.C.1981)
 
 
 [145]
 Final Rule, 47 Fed.Reg. at 25,937
 
 
 [146]
 104 S.Ct. at 1217
 
 
 [147]
 See supra notes 90-101 and accompanying text. Similarly, respondents' reliance upon Disabled in Action v. Mayor and City Council of Baltimore, 685 F.2d 881 (4th Cir.1982), must fail, not for one but for at least three reasons. First, in holding that the Baltimore [Orioles] Baseball Club, as a nonexclusive lessee of a federally-assisted municipal stadium, was not subject to section 504 obligations, the Disabled court pointed repeatedly to Angel, which we have criticized, and to the "indirect" nature of the aid involved, which cannot be weighted so heavily after Grove City. Second, the court's analysis in Disabled centered upon problems of enforcement and compliance, implicating issues not only of "directness" but of "affirmative action" not present in the instant case (Club legally powerless to make "extensive physical alterations demanded by plaintiffs," id. at 685). Third, in no sense was access to baseball games as central a concern of Congress in enacting the Rehabilitation Act of 1973 as was nondiscriminatory access to vital modes of transportation and, thereby, to employment opportunities that might otherwise be denied solely on account of handicap. See infra notes 148-156 and accompanying text
 
 
 [148]
 See North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 520, 102 S.Ct. 1912, 1917, 72 L.Ed.2d 299 (1982); Greyhound Corp. v. Mt. Hood Stages, Inc., 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978)
 
 
 [149]
 456 U.S. at 421, 102 S.Ct. at 1918, citing United States v. Price, 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966)
 
 
 [150]
 29 U.S.C. Sec. 792(a), (b)(2) (Supp. V 1981)
 
 
 [151]
 See supra note 116 and accompanying text
 
 
 [152]
 S.REP. NO. 318, 93d Cong., 1st Sess., reprinted in 1973 U.S.CODE CONG. & AD.NEWS 2076, 2122
 
 
 [153]
 As explained by the comments of the United Cerebral Palsy Associations during the CAB's rulemaking proceedings below:
 [t]he American people are dependent on air travel for vital opportunities [since] many people must travel by air in order to perform their jobs. Clearly, access to air travel is not a luxury[;] it is vital to anyone wishing to participate in the mainstream of society.
 J.A. at 166.
 
 
 [154]
 The ATBCB not only supported PVA's position on the meaning of "federal financial assistance" and the proper scope of section 504, see Final Rule, 47 Fed.Reg. at 25,937, but vigorously criticized the CAB's initial decision to deliberately avoid any requirement of structural changes in aircraft. See supra note 17 and accompanying text. That decision, the ATBCB argued,
 seriously weakens the effect of the services requirements. A disabled person's theoretical right to air travel is meaningless if he or she cannot board the plane, go from the entry to his or her seat conveniently and with dignity, travel about the cabin, and use the lavatory. From our inquiries it is apparent that technology for equipment and alterations to facilitate such access and use does exist, especially in the industrial design divisions of the airlines. We urge the CAB to act quickly to promulgate requirements both for inexpensive retrofitting and for structural design of new aircraft.
 Comments of United States Architectural and Transportation Barriers Compliance Board before the Civil Aeronautics Board, Sept. 5, 1979, J.A. at 146, 148.
 
 
 [155]
 This is not to say that section 504 requires profound or extremely costly "affirmative action" in the form, for example, of extensive structural modification of aircraft. See supra note 154, and note 17 and accompanying text. In the context of educational programs the Supreme Court has noted that "neither the language, purpose, nor history of Sec. 504 reveals an intent to impose an affirmative-action obligation on all recipients of federal funds," Southeastern Community College v. Davis, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980, so that "substantial modifications" in programs of a nursing school were not required in order to accommodate a deaf applicant for admission. Id. Relying upon Davis, this court has held that regulations that "require extensive modifications of existing systems and impose extremely heavy financial burdens on local transit authorities" are not valid under Sec. 504. American Public Transit Ass'n v. Lewis, 655 F.2d 1272, 1278 (D.C.Cir.1981). But we recognized in Lewis, as the Supreme Court had in Davis, that "the line between impermissible discrimination and optional affirmative action is a fine one," 655 F.2d at 1277, and that a "refusal to take modest, affirmative steps to accommodate handicapped persons might well violate the statute." Id. at 1278. In the instant case we are presented with just such modest steps, with an agency so finely attuned to expense that it explicitly eschewed any request for structural modifications, see supra note 154, and with an agency so acutely aware of the need for case-by-case decisionmaking that it deferred to the air carrier's discretion and the need for flexibility at every turn. See supra notes 59-66 and accompanying text. In Lewis, by contrast, the rules in question were acknowledged by the agency itself, in so many words, to be " 'extraordinarily expensive,' " (requiring "extensive" modifications of existing systems, including, inter alia, accessibility to wheelchairs of every new bus or subway car "regardless of cost," and elevators and other additions to existing subway stations). 655 F.2d at 1278. The case before us is not Lewis. In any event, both Lewis and Davis go to the substantive nature of the regulations and "the kind of burdensome modifications" they may require, id., not to the jurisdictional scope of agency rulemaking under Sec. 504
 
 
 [156]
 Comments of the Architectural and Transportation Barriers Safety Board, Sept. 5, 1979, J.A. at 146, 147
 
 
 [157]
 See supra notes 90-101, 144-147 and accompanying text
 
 
 [158]
 Final Rule, 47 Fed.Reg. at 25,937
 
 
 [159]
 See supra notes 21-29 and accompanying text
 
 
 [160]
 See supra notes 30-45, 68-78 and accompanying text
 
 
 [161]
 Final Rule, 47 Fed.Reg. at 25,937-38
 
 
 [162]
 Respondents' Brief at 4; 49 U.S.C. Sec. 1374(a) (1976)
 
 
 [163]
 47 Fed.Reg. at 25,937
 
 
 [164]
 Respondents' Brief at 11
 
 
 [165]
 Even if the specific requirements of Subpart B were considered important interpretive guidelines by courts construing Subpart A's application to all carriers, they would not be agency rules binding airlines with the force of law. Private suits seeking enforcement of the Subpart B requirements, in actions for both injunctive and monetary relief, might not be available to the vast majority of handicapped persons who must travel by air. See Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1978); see also Consolidated Rail Corp. v. Darrone, --- U.S. ----, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984). The Subpart C regulations authorizing cease and desist orders and the assessment of civil penalties for noncompliance would not, of course, be in force
 
 
 [166]
 Final Rule, 47 Fed.Reg. at 25,938
 
 
 [167]
 See supra notes 61-63 and accompanying text
 
 
 [168]
 Final Rule, 47 Fed.Reg. at 25,938
 
 
 [169]
 See supra note 133 and accompanying text
 
 
 [170]
 See supra notes 134-35 and accompanying text. In commenting upon the CAB's rules, the DOT urged the Board to ensure that "the regulations of both agencies [would] be compatible." J.A. at 76
 
 
 [171]
 In addition to its specific transportation-related goals, in 1974 Congress made plain its objective that section 504 "be administered in such a manner that a consistent, uniform, and effective Federal approach to discrimination against handicapped persons would result." S.REP. NO. 1297, reprinted in 1974 U.S.CODE CONG. & AD.NEWS at 6391
 
 
 [172]
 See, e.g., infra notes 207-11 and accompanying text
 
 
 [173]
 Pub.L. No. 98-443, 98 Stat. 1703, 98th Cong., 2d Sess. (Oct. 4, 1984)
 
 
 [174]
 98 Stat. at 1711
 
 
 [175]
 See supra note 154
 
 
 [176]
 Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction. Red Lion Broadcasting v. FCC, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801-02, 23 L.Ed.2d 371 (1969)
 
 
 [177]
 See, e.g., notes 54-63 and accompanying text
 
 
 [178]
 See notes 64-66 and accompanying text
 
 
 [179]
 Amended Final Rule, 47 Fed.Reg. at 51,858. As noted supra note 64, this definition incorporated minor changes from the Final Rule, in order to accommodate, for example, a "person" who was not a "passenger" (e.g., someone merely seeking information), and in order to clarify an earlier phrase designed to minimize "arbitrary or impulsive" reactions by airline personnel resulting in requests "beyond standard practices." Instead, the Amended Final Rule mandates that "requests of airline personnel must be safety-related or necessary for the provision of air transportation to be considered reasonable" for the purposes of the rule. Id
 
 
 [180]
 29 U.S.C. Sec. 794 (Supp. V 1981)
 
 
 [181]
 Southeastern Community College v. Davis, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979)
 
 
 [182]
 See supra note 28
 
 
 [183]
 Amended Final Rule, 47 Fed.Reg. at 51,858 (to be codified at 14 C.F.R. Sec. 382.3). This definition is to be applied with respect to the provision of air transportation only. The CAB's definition "with respect to the provision of related services" (such as access to flight information) requires that a handicapped person meet "the essential eligibility requirements for receipt of those services." Amended Final Rule, 47 Fed.Reg. at 51,858 (to be codified at 14 C.F.R. Sec. 382.3(d)). Petitioners do not challenge the legality of the latter definition
 
 
 [184]
 PVA Brief at 51; see supra text accompanying note 54
 
 
 [185]
 See, e.g., Letter from Al Van Nevel to President, Ozark Airlines (May 17, 1979), J.A. at 175 (airline refused to begin flight after discovering five hearing-impaired persons on board); Letter of Marianne J. Cashatt, Director, Special Services, Virginia Department of Rehabilitative Services to CAB (Nov. 12, 1979), J.A. at 69 (on-board attendant required for person who needed no assistance once aboard the plane); see also Washington Post, Dec. 18, 1984, at A-17, col. 2 (airline charged with discriminating against passengers who are both blind and deaf by forcing them to travel with a companion)
 
 
 [186]
 See, e.g., Comments of National Federation of the Blind to the CAB, J.A. at 174 (blind couple asked to sit on blankets, apparently due to assumption that all handicapped people are incontinent); Letter of Nancy L. Kaye, Ph.D. to Congressman Robert Kastenmeier (March 14, 1980), J.A. at 66 ("airline personnel shouting at me because they believe I am deaf, speaking slowly because I may be mentally impaired and/or using a condescending tone of voice because they assume I am a child ....")
 
 
 [187]
 See, e.g., notes 13, 35, 61-63 and accompanying text
 
 
 [188]
 As respondents note, even carriers using essentially identical aircraft may utilize alternative design configurations for the plane's interior, for example, utilizing denser seating arrangements or less room for carry-on luggage than their competitors. Respondents' Brief at 37
 
 
 [189]
 This is so despite the fact that, as explained supra notes 54-63 and accompanying text, maximum flexibility was granted to airlines in several specific instances. The Board did not, we believe, ever lose sight of the "strong countervailing interest" of the handicapped. See supra note 62
 
 
 [190]
 Final Rule, 47 Fed.Reg. at 25,949 (emphasis added)
 
 
 [191]
 Id. (emphasis added)
 
 
 [192]
 Id
 
 
 [193]
 See supra note 179 and accompanying text
 
 
 [194]
 Final Rule, 47 Fed.Reg. at 25,948 (Sec. 382.5(a)); nor may a carrier provide "separate or different" services that are unwanted or unnecessary. Id. (Sec. 382.5(b)); see supra notes 23, 24 and accompanying text
 
 
 [195]
 See, e.g., Bargmann v. Helms, 715 F.2d 638 (D.C.Cir.1983) (emphasizing strong and comprehensive concern of Congress for "maximum possible safety" in the air)
 
 
 [196]
 Final Rule, 47 Fed.Reg. at 25,939
 
 
 [197]
 Action for Children's Television v. FCC, 564 F.2d 458, 472 (D.C.Cir.1977); see also United States v. Allegheny Ludlum Steel Corp., 406 U.S. 742, 758, 92 S.Ct. 1941, 1951, 32 L.Ed.2d 453 (1972)
 
 
 [198]
 National Small Shipments Traffic Conference v. CAB, 618 F.2d 819, 826-27 (D.C.Cir.1980) (reviewing court "must affirm the challenged regulations unless we find that the Board's decision was 'arbitrary and capricious,' or in excess of its statutory authority, or adopted without observance of the procedure required by law")
 
 
 [199]
 This "compliance" subpart of the Final Rule, see supra notes 39-45 and accompanying text, modified the original proposal by, inter alia, making it
 clear that individual complaints will be processed according to the Board's standard enforcement procedures, and that the Board may assess civil penalties or issue an order to cease and desist rather than withdraw financial assistance.
 Final Rule, 47 Fed.Reg. at 25,947. Evidently, the Board was concerned that withdrawal of federal subsidies (the only "assistance" it considered at the time) might be too draconian a sanction in certain cases.
 "In withdrawing financial assistance," the Board reasoned,
 the Board is limited to a suspension or termination of financial assistance to the particular program or activity with respect to which there has been a finding on noncompliance. In the case of a carrier receiving separate subsidies under section 419 of the Act for serving several eligible points, we view this limitation as permitting us to withdraw the subsidy only for the route or routes where the violation occurred. Carriers receiving subsidy under 406 of the Act would not benefit from this limitation to the same extent because the financial assistance they receive is intended to help their entire system. Thus, a violation of any part of their subsidy-eligible system may justify the withdrawal of the section 406 subsidy.
 Id.
 In view of our holding today, this sort of hair-splitting about federal financial assistance to commercial air carriers becomes moot and will be deleted, we assume, on remand. Correspondingly, however, the Board's decision to emphasize that such options as cease and desist orders and the assessment of civil penalties are available to the agency as sanctions of air carriers found to violate the Rule becomes even more important. We assume that denying an offending carrier access to federally-assisted airports in general or to a particular airport on a particular route is likely to be a sanction seldom applied, at the agency's discretion, primarily in egregious cases.
 
 
 [200]
 Final Rule, 47 Fed.Reg. at 25,949
 
 
 [201]
 Id. Cf. supra note 37 and accompanying text (Proposed Rule)
 
 
 [202]
 Amended Final Rule, 47 Fed.Reg. at 51,858. The final regulations also indicate that a carrier may not refuse to provide "extensive special assistance" if necessary equipment or personnel can be made available "by reasonable efforts ... without delaying the flight." Final Rule, 47 Fed.Reg. at 25,949 (Sec. 382.13(d))
 
 
 [203]
 See supra note 66 and accompanying text
 
 
 [204]
 See supra note 155
 
 
 [205]
 Here the Board was being especially solicitous of the small, subsidized airlines which were, in its opinion at the time, the only carriers to which its regulations would apply. It expressed its concern "that Federal regulatory requirements not be so burdensome that airlines will be discouraged from volunteering to provide essential air service to small communities or be forced out of business altogether." Final Rule, 47 Fed.Reg. at 25,940
 
 
 [206]
 See supra notes 197, 198 and accompanying text
 
 
 [207]
 See supra note 205
 
 
 [208]
 Final Rule, 47 Fed.Reg. at 25,945
 
 
 [209]
 Respondents' Brief at 42, 43
 
 
 [210]
 The ATBCB saw "no need to set a time limit on notice that a wheelchair will be needed, as it is a simple matter to have these available. It may be reasonable to require four or five hours' notice when a lift will be needed so that the airport can assure its availability; but in an emergency, where the handicapped passenger cannot give the required notice, the airline should be required to board the passenger in some manner. We understand the need for advance notice for oxygen and special meals. However, we urge that the notice requirement ... be limited to 24 hours (the notice now required by several airlines such as American and United [and TWA] .... It is our hope that when services for the handicapped are more fully integrated into routine air travel, advance notice will become unnecessary." Comments of the Architectural and Transportation Barriers Compliance Board before the Civil Aeronautics Board, supra note 156, J.A. at 151, 152
 
 
 [211]
 The DOT stated that "the 48 hours advance notice suggested by the Board is unduly long. Provision of wheelchairs would not appear to require any unusual effort or training on the part of airline employees; and many airlines already provide wheelchairs for handicapped passengers during boarding of aircraft, without advance notice ... Any advance notice requirement which may be imposed should be filed by each carrier and justified to the Board as reasonable." Comments of U.S. Department of Transportation before the Civil Aeronautics Board, Sept. 13, 1979, J.A. at 81-82
 
 
 [212]
 Airline Deregulation Act of 1978, Pub.L. No. 95-504, 92 Stat. 1705 (codified in scattered sections of 49 U.S.C.)
 
 
 [213]
 Civil Aeronautics Board Sunset Act of 1984, Pub.L. No. 98-443, 98 Stat. 1703; see also Notice of Proposed Rulemaking, Transfer of Civil Aeronautics Board Functions to DOT, 49 Fed.Reg. 46,006 (Nov. 21, 1984)
 
 
 [214]
 See supra notes 173, 174 and accompanying text
 
 
 [215]
 See supra notes 132, 134, 169-176 and accompanying text. The intent of Congress, indeed, will be vindicated in several respects: not only will handicapped persons have greater access to commercial air transportation, but unnecessarily confusing--in some cases duplicative or overlapping, in other cases inconsistent or nonsensical--regulations will be rationalized under the aegis of a single agency
 
 
 [216]
 The CAB and other agencies have sometimes seemed reluctant to act upon their statutory obligations in this area, requiring prodding from other agencies, the President, and the courts. See supra notes 5-12 and accompanying text. In this regard the DOT has been generally more vigorous, as reflected in its regulation of airports, its early willingness to regulate air carriers if the CAB had not asserted its own jurisdiction, and its comments in the proceedings below
 
 
 [217]
 In a recent case involving air safety this court similarly found the FAA's "attempt to limit artificially its regulatory authority ... unreasonable." Bargmann v. Helms, 715 F.2d 638, 642 (D.C.Cir.1983) (Mikva, J.). We have been presented in the instant case, as we were in Bargmann, essentially
 with an agency's refusal to exercise its discretion, based on its belief that it has no power to do otherwise. In this situation, while the agency has the first word on its regulatory jurisdiction, it does not have the last. It is well within the tradition of our review of agency action ... to make an independent inquiry into an agency's allegation that it lacks the statutory authority to act.
 Id. at 641 (citations omitted). See also Exxon Corp. v. FTC, 665 F.2d 1274 (D.C.Cir.1981); NAACP v. FPC, 520 F.2d 432 (D.C.Cir.1973), aff'd, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976); National Org. for Reform of Marijuana Laws v. Ingersoll, 497 F.2d 654 (D.C.Cir.1974). Where, as here, the agency's own "first word" has been inconsistent--construing its own authority first broadly, then narrowly--this court's obligation of independent inquiry on review is greater still, and any deference due the agency on the jurisdictional issue is correspondingly minimized.
 
 
 [1]
 Section 504 provides:
 No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....
 29 U.S.C. Sec. 794 (1982) (emphasis added).
 Title VI of the Civil Rights Act of 1964 provides:
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 42 U.S.C. Sec. 2000d (1982) (emphasis added).
 Title IX of the Education Amendments of 1972 provides:
 No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....
 20 U.S.C. Sec. 1681(a) (1982) (emphasis added).
 
 
 [2]
 Indeed in previous regulations under Title VI, the Federal Aviation Administration recognized that in the case of aid to airports, the scope of "program or activity receiving Federal assistance" only reached operations at the airport and not air transportation:
 (2) The operator of an airport who is the recipient of Federal financial assistance is bound by the conditions and covenants in the conveyance that prohibit, among other things, discrimination for reason of color, race or national origin in admission of the public to waiting rooms, sightseeing areas, sanitary facilities, and any other facilities under the control of the airport operator himself.
 
 
 [14]
 C.F.R. Sec. 15.5(c)(2) (1968). The successor regulation, 49 C.F.R. Part 21, Appendix c(a)(2) (1984), was expanded to clarify that any activity physically taking place in the airport was covered even if the airlines leased or bought the space